| GOVERNMENT DEVELOPMENT BANK | : | CIVIL ACTION |
| FOR PUERTO RICO, et al. | : | |
| | : | |
| v. | : | |
| | : | |
| HOLT MARINE TERMINAL, INC., | : | |
| et al. | : | NO. 02-7825 |

## MEMORANDUM

McLaughlin, J.                                          March 24, 2011

This suit concerns withdrawal liability incurred by a
bankrupt shipping company, NPR, Inc. ("NPR"), under the Employee
Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.
§ 1001 et seq., as amended by the Multiemployer Pension Plan
Amendments Act of 1980 (the "MPPAA"), 29 U.S.C. § 1381 et. seq.
The plaintiffs are two entities that were secondarily liable for
NPR's withdrawal liability, and which paid over $14 million to a
pension fund in satisfaction of NPR's withdrawal liability.  In
this suit, the plaintiffs seek to recover NPR's withdrawal
liability from a number of NPR's corporate affiliates and those
affiliates' individual owners under several theories, including
alter ego and veil piercing.  All of these affiliates are part of
a closely-held group of companies owned by members of the Holt
family.

The defendants fall into two groups.  The first
consists of individual defendant Thomas Holt, Sr. ("Holt Sr.")

and his wholly-owned company, Orchard Hill Development Corporation ("Orchard Hill"). The second comprises the three sons of Thomas Holt, Sr. - Michael, Leo and Thomas, Jr. - ("the Holt Sons") and ten companies they control ("the Holt Sons Companies").[1] Collectively, the Court will refer to the Holt Sons and their companies as the "Holt Sons Defendants." The plaintiffs advance distinct theories of liability for each group of defendants.

Under ERISA and the MPPAA, withdrawal liability is imposed on an "employer" upon a full or partial withdrawal from a multi-employer pension plan. 29 U.S.C. § 1381(a). The applicable definition section provides that, in addition to statutory employers,[2] all "trades or businesses (whether or not incorporated) which are under common control," as defined by Treasury regulations, constitute a single employer. 29 U.S.C. § 1301(b)(1).

With respect to Holt Sr. and Orchard Hill, the plaintiffs principally argue that those defendants are "trades or

---

[1]These companies are Delaware Avenue Enterprises, Inc., Gloucester Marine Terminal, Inc., Express Equipment Rental Co., OAE, Inc., Portside Refrigerated Services, Inc., The Tanglefoot Corporation, Essex Enterprises, Inc., Broad and Washington Corporation, SLS Services, Inc. d/b/a Holt Oversight, and Holt Oversight & Logistical Technologies, Inc.

[2]As will be explained below, the term "employer" has not been defined in the statute, but instead has been left to the courts.

2

businesses" under common control with NPR and are therefore statutorily liable for NPR's withdrawal.

With respect to the Holt Sons Defendants, the plaintiffs advance alter ego and veil piercing theories. The plaintiffs contend that the operations of the Holt Sons Companies and Holt Sr.'s companies, including NPR, were so intertwined that the companies merged into a common "Holt Family Enterprise" and became alter egos. First Am. Compl. ("Am. Compl.") ¶ 25. The plaintiffs emphasize the role of SLS Services, Inc. d/b/a Holt Oversight ("SLS"), a company owned by the Holt Sons, in this enterprise. According to the plaintiffs, SLS served as the principal link connecting all of the Holt-related entities. Am. Compl. ¶ 40. In view of this enterprise, the plaintiffs argue that the Holt Sons Companies should be liable for NPR's withdrawal as alter egos of NPR. The plaintiffs then urge the Court to pierce the veil of the Holt Sons Companies and hold the Holt Sons individually liable.

Both groups of defendants have moved separately for summary judgment. The plaintiffs have cross-moved for summary judgment against Holt Sr. and Orchard Hill. In their opposition to the Holt Sons Defendants' motion, the plaintiffs have both argued against summary judgment on the merits and, alternatively, have filed a Rule 56(f) affidavit requesting additional discovery before a decision on summary judgment. Finally, the Holt Sons

3

Defendants have filed a motion to exclude the plaintiffs' expert on alter ego liability, Louis R. Pichini.

In this memorandum, the Court addresses the Holt Sons Defendants' motion for summary judgment. For the reasons that follow, the Court will grant the motion.

## I.   Procedural History

The plaintiffs filed their original complaint on October 10, 2002, against several corporate affiliates of NPR (hereinafter the "Original Defendants").[3] The original complaint, which was premised solely on a "controlled group" theory of liability pursuant to 29 U.S.C. § 1301(b), alleged that the Original Defendants were responsible for NPR's withdrawal liability as members of NPR's controlled group. After the Original Defendants filed a motion for summary judgment, the plaintiffs requested leave to file an amended complaint and to conduct additional discovery, which the Court granted.

On September 20, 2004, the plaintiffs filed an amended complaint, which added as defendants SLS, Holt Oversight &

---

[3]The Original Defendants included: Delaware Avenue Enterprises, Inc., Gloucester Marine Terminal, Inc., Express Equipment Rental Co., OAE, Inc., Orchard Hill Development Corporation, Portside Refrigerated Services, Inc., The Tanglefoot Corporation, Essex Enterprises, Inc., and Broad and Washington Corporation. The complaint also named Holt Marine Terminal, Inc., which is not a legal entity and was omitted from the amended complaint.

Logistical Technologies, Inc.,[4] Holt Sr. and the three Holt Sons.
Moreover, the plaintiffs added supplemental theories of liability
based on alter ego and veil piercing. As a consequence, the
plaintiffs' underlying theories of liability have shifted
multiple times throughout the course of this litigation.[5]

The Holt Sons Defendants filed the present motion for
summary judgment on November 15, 2006. After a full round of
briefing, the Court heard oral argument on December 13, 2007.
The Court will now grant the motion.

## II.  Summary Judgment Record[6]

In accordance with this Court's procedures, the Holt
Sons Defendants included a summary of undisputed facts, coupled
with citations to the record, in their motion for summary
judgment. In their opposition brief, the plaintiffs argue that
many of the facts set forth in the Holt Sons Defendants' motion
are in dispute. However, after a careful examination of the
record, the Court finds the facts to be largely undisputed.

---

[4]Holt Oversight & Logistical Technologies, Inc., is
presently known as Holt Logistics Corp.

[5]Indeed, as the Court will discuss below, the plaintiffs
have added an additional theory of liability in their opposition
to the Holt Sons Defendants' motion for summary judgment.

[6]On a motion for summary judgment, the Court considers the
evidence in the light most favorable to the nonmoving party.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

Instead, it is the parties' characterization of the facts, and the conclusions to be drawn therefrom, that are in dispute. Therefore, the Court will present the largely undisputed facts below, and will note where disputes exist in the record.

A.    NPR Acquires the Assets of the PRMSA and Becomes Obligated to the Fund; the PRMSA and GDB Become Secondarily Liable for Any NPR Withdrawal Liability

The plaintiffs are the Government Development Bank for Puerto Rico ("GDB") and the Puerto Rico Maritime Shipping Authority ("PRMSA"). Prior to 1995, the PRMSA was engaged in the shipping business. In its shipping operations, the PRMSA used the Port of Elizabeth in New Jersey and thereby became obligated to pay into the New York Shipping Association - International Longshoreman's Association Pension Trust Fund (the "Fund"), a multi-employer pension plan subject to the withdrawal liability provisions of ERISA. Am. Compl. ¶¶ 13, 15; Holt Sons Mem. of Law in Support of the Mot. for Summ. J. ("Holt Sons S.J. Br."), at 4.

In February 1995, some of the PRMSA's assets and stock were acquired by NPR, a private shipping company.[7] After the acquisition, NPR continued to conduct shipping at the Port of Elizabeth and made payments into the Fund. Because NPR was

_____

[7]The transaction involved both NPR and its related companies NPR-Navieras Receivables, NPR Holding Corporation and NPR S.A, Inc. In their briefing, both parties use the term "NPR" to encompass these related entities.

6

obligated to contribute to the Fund, the PRMSA did not incur
immediate withdrawal liability as a result of the asset transfer.
However, the PRMSA remained secondarily liable for such liability
in the event that NPR partially or fully withdrew from the Fund
within five years of the sale. Am. Compl. ¶¶ 16-17; Dep. of
Delfina Betancourt ("Betancourt Dep."), Ex. 17 to Holt Sons S.J.
Br., at 30; see also 29 U.S.C. § 1384.

The PRMSA's transfer of assets to NPR required the
approval of the Puerto Rican legislature. As a condition of that
approval, the Puerto Rican legislature required the GDB to
guarantee the PRMSA's existing liabilities. In April 1997, the
GDB and the PRMSA entered into a settlement agreement with NPR
and the Fund. In the agreement, among other provisions, the Fund
agreed that the PRMSA had not incurred withdrawal liability in
transferring assets to NPR; NPR agreed that it would be primarily
liable for any withdrawal liability arising after the transfer;
and GDB and the PRMSA agreed that, in the event that NPR became
subject to withdrawal liability and failed to pay, they would be
jointly and severally liable for any unpaid liability up to a
specified amount. Betancourt Dep. at 28; April 23, 1997,
Settlement Agreement, Ex. A. to the Aff. of Patrick M. Northen
Esq. ("Northen Aff."), Ex. 4 to Holt Sons S.J. Br.

B.   NPR is Acquired by Holt Cargo and The Holt Group

On September 25, 1997, NPR was purchased by Holt Cargo Systems, Inc. ("Holt Cargo"), a company owned by defendant Holt Sr.  On November 20, 1997, Holt Cargo assigned its ownership in NPR to the Holt Group, Inc. ("Holt Group"), a holding company. Neither the Holt Group nor Holt Cargo is a defendant to the present action.  Stock Purchase Agreement between NPR and Holt Cargo, Ex. A to the Aff. of Lisa A. Kline, Esq. ("Kline Aff."), Ex. 5 to Holt Sons S.J. Br.; Assignment Agreement between Holt Cargo and The Holt Group, Ex. B to Kline Aff.

The Holt Group was created to facilitate the financing for NPR's acquisition by consolidating the ownership of all of the companies owned by Holt Sr., including both Holt Cargo and NPR, into one holding company.  However, the Holt Sons Companies did not form part of the Holt Group, because Holt Sr. did not own these entities.[8]  From November 20, 1997, until NPR's liquidation in 2002, the Holt Group owned 100% of the stock of NPR, and Holt Sr. owned 100% of the stock of the Holt Group.  Therefore, after November 20, 1997, no person or entity other than the Holt Group had any ownership interest in NPR.  September 10, 2003, Dep. of

---

[8]As of the date of NPR's withdrawal, all of the Holt Sons Companies were owned directly or indirectly by the Holt Sons, with the exception of Portside Refrigerated Services ("Portside").  Portside was owned by three long-time employees of the Holt Group or its subsidiaries: Lorraine Robins, Bernard Gelman, and John Evans.  Stock Certificates, Ex. R. to Kline Aff. at D0124-8.

Holt, Sr. ("9/10/03 Holt Sr. Dep."), Ex. 18 to Holt Sons S.J. Br., at 49-50; Betancourt Dep. at 68-69.

Before acquiring NPR, the Holt Group's principal business was conducting stevedoring, warehousing and inland shipping operations at the Ports of Philadelphia and Wilmington. NPR was acquired, in part, to provide shipping services that could be integrated into the Holt Group's existing operations, thereby providing customers with an opportunity for "one stop shopping." August 14, 2006, Dep. of Holt, Sr. ("8/14/06 Holt Sr. Dep."), Ex. 2 to App. A to the Pls.' Br. in Opp'n to the Holt Sons S.J. Br. ("Pls. Opp'n"), at 24-26, 31.

Prior to the acquisition, NPR transported goods between Puerto Rico and the mainland United States, with regular stops at the ports of Houston, Miami, Jacksonville, and the Port of Elizabeth, New Jersey. After the acquisition, NPR changed the ports it serviced, stopping regular service at the Ports of Houston, Miami, and Elizabeth and making its principal port of call the Packer Marine Terminal at the Port of Philadelphia. In its operations at the Packer Marine Terminal, NPR utilized the stevedoring, trucking, maintenance, warehousing, and logistics services of other companies in the Holt Group, as well as companies owned by the Holt Sons. For example, after acquiring NPR, Holt Sr. formed Emerald Leasing, which purchased $35 million worth of NPR's equipment and leased it back to NPR for monthly

payments. The Holt Sons Defendants conceded that the Holt Sons
Companies served as "landlords, tenants, suppliers and/or service
providers for various of the Holt Group Companies." Holt Sons
S.J. Br. at 30; 8/14/06 Holt Sr. Dep. at 19-26, 28-32; 1999 Holt
Group 10-K, Ex. 103 to App. C. to the Pls.' Opp'n, at NR-001859-
60.

Both before and after its acquisition, NPR maintained
its corporate headquarters in Edison, New Jersey. NPR ran
several departments, including a treasury department, out of its
Edison headquarters. NPR also had additional business locations
in the United States and Puerto Rico, including sales and
administrative offices in San Juan, Chicago, Washington, and
Miami, and marine terminal operations in San Juan, Philadelphia,
and Jacksonville. 8/11/06 Holt Jr. Dep. at 46; August 11, 2006,
Dep. of John Whiteley ("8/11/06 Whiteley Dep."), Ex. 24 to Holt
Sons S.J. Br., at 27-28; 8/4/00 Holt Group 10-K at 14-15.

When NPR was acquired by the Holt Group in September
1997, NPR's president was Ronald Katims. Mr. Katims remained
NPR's president until February 1, 1999, when he was removed by
Holt Sr., and replaced by Holt Sr.'s son, defendant Thomas Holt,
Jr. Several other top executives of NPR were individual
investors who had been significant shareholders of NPR prior to
its acquisition by the Holt Group. 9/3/03 Dep. of Thomas Holt,
Jr. ("9/3/03 Holt Jr. Dep."), Ex. 22 to the Holt Sons S.J. Br.,

at 36-39.

One such executive was Carl Fox, NPR's Executive Vice President for Strategic Planning and Administration, who was an equity holder prior to NPR's acquisition by the Holt Group. In his role as Executive Vice President, which he held until NPR's liquidation, Mr. Fox testified that his responsibilities included overseeing operations relating to information technology, purchasing, administrative services, public relations, and asset deployment and re-engineering. The directors of several departments, including IT, Purchasing, Planning, Human Resources, and Reengineering, reported directly to Mr. Fox. Mr. Fox, in turn, reported directly to NPR's president. Mr Fox was never employed by any other entity owned by a member of the Holt Family. Aff. of Carl R. Fox ("Fox Aff."), Ex. 1 to the Holt Sons S.J. Br., ¶¶ 4-5, 6, 9; August 10, 2006, Dep. of Leo Holt pursuant to Fed R. Civ P 30(b)(6) ("L. Holt 30(b)(6) Dep."), Ex. 23 to Holt Sons S.J. Br., at 50; Aff. of Paul J. Breeman ("Breeman Aff."), Ex. 2 to the Holt Sons S.J. Br., ¶ 11.

Other investors who held equity in NPR prior to its acquisition by the Holt Group, and who remained employed until NPR's bankruptcy, included John Tirpak, NPR's Director of Commercial Operations; Martin McDonald, NPR's Senior Vice President for Labor Relations; and Mario Escudero, NPR's Senior Vice President and General Counsel. In contrast, several

11

executives who were employed by NPR at the time of its acquisition by the Holt Group subsequently left NPR. Edward O'Donnell served as Senior Vice President for Sales until he was terminated by NPR and replaced by Ron Gabbett.[9] Ed Cawthon served as Senior Vice President for Operations until he retired and was replaced by David Whene. Breeman Aff. ¶¶ 12, 14-18.

In 2000, three years after its acquisition, NPR operated five ships, had over 2000 customers, and handled 112,000 loads a year. The Holt Group attributed over $200,000,000 in revenues in 2000 to NPR's shipping activities. August 11, 2006, Dep. of Thomas Holt, Jr. ("8/11/06 Holt Jr. Dep."), Ex. 22 to Holt Sons S.J. Br., at 59-60; SEC Form 10-K for Holt Group Inc; ("8/4/00 Holt Group 10-K"), Ex. C to Northen Aff. at 6, 7, 27.

C.  NPR Transfers Certain Operations to SLS

Beginning with NPR's acquisition of assets from the PRMSA in 1995, NPR's management adopted a strategic plan to cut costs and reduce excess labor expenses, such as the "legacy costs" associated with NPR's unionized clerical office staff. One component of NPR's cost-cutting strategy was to outsource certain administrative and logistical services, also known as "back office" services, to third party providers. This strategy,

---

[9]John Tirpak initially reported to Mr. O'Donnell, and later, to Mr. Gabbett. These individuals oversaw a sales and marketing staff of approximately 25 persons. Breeman Aff. ¶ 16.

which began in 1995, continued after NPR was acquired by the Holt Group in November 1997. As part of its outsourcing efforts, NPR ultimately retained SLS Services, Inc. d/b/a Holt Oversight ("SLS")[10] – a company owned by the Holt Sons – as a service provider, beginning in 1998. Because the plaintiffs argue that SLS served as the common link between the Holt-related entities, a substantial portion of the record is devoted to SLS's operations. Fox Aff. ¶¶ 10, 11, 12; 8/11/06 Holt Jr. Dep. at 44-45.

## 1.    Formation and Business Operations of SLS

SLS was formed by the Holt Sons in 1994 at Holt Sr.'s suggestion that his sons establish a business that could offer logistical and "back office" services to other companies,[11] thereby relieving companies of the burdens of managing back office functions internally. By outsourcing back office functions to SLS, SLS's clients – which would include Holt Sr.'s companies – could focus on their core business activities. 9/10/03 Holt Sr. Dep. at 59-61.

---

[10]Although the defendants refer to this entity simply as "SLS," the plaintiffs refer to it as Holt Oversight. In view of the large number of entities that share the name "Holt," the Court will refer to this entity as SLS to avoid confusion.

[11]Back office services refer to administrative and logistics functions, such as accounting and financial services. Holt Sons S.J. Br. at 22.

13

SLS issued its initial shares on February 24, 1994, and ceased operations after entering bankruptcy in 2002.  The Holt Sons were the initial shareholders of SLS, and had equal ownership with one hundred shares each.  SLS began operations with minimal capital contributions, and between 1994 and 1999, SLS received approximately $1,277,000 in loans from other companies, including a loan from Holt Cargo.  The parties do not describe the terms of the loans or whether they were ever repaid, and the record is unclear on this question.  In his deposition, Holt Sr. stated that the loans from his companies were not intended as capital contributions, nor were they made for the purpose of acquiring equity in SLS.  Nonetheless, it is undisputed that between SLS's formation in 1994 and its bankruptcy in 2002, neither Holt Sr. nor any of his companies had any ownership interest in SLS.  Moreover, neither SLS nor any of the Holt Sons Companies shared ownership with NPR.  SLS Stock Certificates, Ex. S to Kline Aff; 8/11/06 Whiteley Dep. at 127-38; August 14, 2006, Dep. of Holt Sr. ("8/14/06 Holt Sr. Dep."), Ex. 20 to Holt Sons S.J. Br., at 143-45; Stock Certificates, Exs. E-R to Kline Aff.

In the course of its operations, most of SLS's clients were "related parties" that were owned by various members of the Holt family.  More specifically, most of SLS's clients engaged in port and shipping operations at the Packer Avenue Marine Terminal

14

in Philadelphia and the Gloucester Marine Terminal in New Jersey.[12] Nonetheless, no single client contributed the majority of SLS's income, and SLS obtained a small amount of revenue from unrelated third parties. SLS Service Charges Chart, Ex. H to the Northen Aff.; October 21, 2003, Expert Report of Ricardo J. Zayas ("First Zayas Report"), Ex. 8 to Holt Sons S.J. Br., at 8; L. Holt 30(b)(6) Dep. at 97; Aff. of John Janco ("Janco Aff."), Ex. 25 to App. C. to the Pls.' Opp'n ¶¶ 6-7.

Among the "back office" services that SLS offered to its clients were accounting, legal, corporate record keeping, insurance and risk management, centralized purchasing, marketing support, information technology, and logistics. As part of its accounting services, SLS operated a "cash management" system for its clients. SLS's controller, John Whiteley, testified during his deposition that the purpose of the cash management system was to ensure that SLS's clients had sufficient funds to pay invoices when they became due. To effectuate this, SLS divided its clients into three groups: (1) companies owned by Holt Sr.; (2) companies owned by the Holt Sons; and (3) companies owned by unrelated third parties. If one client, "A," had insufficient funds to pay an invoice, SLS would look to trade receivables owed to that particular company by one of SLS's other clients, "B."

---

[12]At one time, some of the Holt Sons Companies engaged in port operations at Gloucester Marine Terminal. September 12, 2003 Dep. of James White ("White Dep."), Ex. 27 to the Holt Sons S.J. Br., at 55-56.

15

If SLS found receivables due to Client A, it would issue a check request for B to make its payable to A, and A in turn would pay its invoice with the funds.

If no trade receivables were available, SLS would look to the other companies in the particular client's "cash management group," corresponding to the three groups outlined above. If a company within the same cash management group had available funds, SLS would facilitate an advance to the client with insufficient funds. However, John Whiteley testified that an advance between companies in different cash management groups - for instance, between Holt Sr.'s companies and the Holt Sons' companies - could not be undertaken without specific authorization. The plaintiffs dispute this fact, and cite to evidence of an advance from Dockside, an unrelated party that was classified as part of Group 3 above, to Essex Enterprises, one of the Holt Sons Companies. In their depositions, the owners of both companies testified that they never authorized, or did not remember authorizing, such advances. September 9, 2003, Dep. of Leo Holt ("9/9/03 L. Holt Dep."), Ex. 25 to Holt Sons S.J. Br., at 23-24; 8/11/06 Holt Jr. Dep. at 104; 8/11/06 Whiteley Dep. at 26-29, 59-65; September 12, 2003 Dep. of James White, ("9/12/03 White Dep."), Ex. 11 to App. A to the Pls.' Opp'n, at 80-83; September 24, 2003 Dep. of Frances Kelly ("9/24/03 Kelly Dep."), Ex. 12 to App. A to the Pls.' Opp'n, at 80.

16

SLS also administered bank accounts on behalf of its clients. Each of SLS's clients maintained its own bank account, but the operating accounts of each of Holt Sr.'s companies - with the exception of NPR - were also linked to a "concentration account." The concentration account to which Holt Sr.'s companies were linked was initially established by Holt Cargo, and later by the Holt Group. The purpose of the concentration account was to "zero out" balances in any company's individual operating accounts at the end of a business day. When an individual company account had excess funds, those funds would be "swept" into the concentration account. Conversely, in the event that an individual account ran a shortfall, funds would be "swept" from the concentration account into the individual account to zero out the balance. In contrast, SLS's clients that were not owned by Holt Sr. did not participate in the concentration accounts. 8/11/06 Whiteley Dep. at 30-35, 88-93.

The specific services that SLS provided to any particular client varied according to the nature of that client's business operations and needs. Because the relationship between SLS and NPR is a focal point of the present action, a substantial portion of the record details the specifics of that relationship.

2.   The Relationship Between NPR and SLS

The plaintiffs argue that many of the facts surrounding the relationship between NPR and SLS are in dispute. However, as explained above, the parties' dispute is more accurately characterized as a dispute over questions of law rather than questions of fact. The following facts relating to the NPR-SLS relationship are therefore not in dispute.

a.   The Client Services Agreements

As part of its outsourcing efforts, NPR entered into two client services agreements with SLS. The agreements, which had effective dates of June 1, 1998, and January 1, 2000, respectively, were negotiated on NPR's behalf by Carl Fox, NPR's Senior Vice President. Pursuant to the agreements, SLS was to "provide personnel to meet and consult with NPR regarding issues arising in connection with NPR's continuing business affairs." The agreements enumerated the services that SLS would provide, which included accounting, information processing, and insurance and risk management. The agreements did not describe SLS's cash management system.[13]

Moreover, pursuant to the Client Services Agreement

---

[13]The agreements between SLS and NPR were substantively similar to the client services agreements between SLS and its other clients, such as Delaware Avenue Enterprises, Inc. ("Del") and Holt Cargo Systems, Inc. See Client Services Agreements with Del and Holt Cargo, Exs. 7-8 to App. C. to the Pls.' Opp'n.

effective January 1, 2000, SLS agreed to develop and implement a customized logistics system that would enable NPR to manage and optimize the movement of containerized cargo. This system would replace NPR's "home grown" system, which NPR deemed to be inefficient. June 1, 1998 Client Services Agreement ("6/1/98 CSA"), Ex. 5 to App. C to the Pls.' Opp'n, at AD 7635, 7637; January 1, 2000 Client Services Agreement ("1/1/00 CSA"), Ex. 3 to App. A to the Pls.' Opp'n, at AD 5336, 5338; 8/11/06 Holt, Jr., Dep. at 49, 51; Fox Aff. ¶ 14.

### b.   Services Provided

The actual level of services that SLS provided to NPR increased over time. Leo Holt, SLS's president, testified during his deposition that when NPR began obtaining services from SLS around 1998, those services were primarily limited to risk management, such as obtaining property and indemnity insurance. Over time, however, NPR outsourced additional functions to SLS, as evidenced by the increased services enumerated in the 2000 client services agreement. SLS began to perform sales and marketing assistance, as well as payroll and accounts receivable functions. In order to provide these services, SLS operated NPR's IBM 3090 computer system, NPR's internally-developed system that performed accounting functions. Eventually, the IBM 3090 system was physically transferred to SLS's offices to facilitate

the use of the system by SLS employees. By 1999 or 2000, SLS had taken over most of NPR's accounting functions, although NPR still maintained a treasury department in Edison. L. Holt 30(b)(6) Dep. at 59-61, 63-64; September 5, 2003, Dep. of John Whiteley ("9/5/03 Whiteley Dep."), Ex. 26 to Holt Sons S.J. Br., at 49-50; August 11, 2006, Dep. of John Whiteley pursuant to Fed R. Civ P 30(b)(6) ("Whiteley 30(b)(6) Dep."), Ex. 6 to App. A to the Pls.' Opp'n, at 171.

Although SLS managed many of its clients bank accounts, NPR's treasury department administered its own bank accounts. NPR's operating accounts were not linked to the Holt Group's concentration account, but were instead linked to NPR's own concentration account, Concentration Account B. Concentration Account B functioned as a "sweep account," similar to the Holt Group's concentration account, and it was used to zero out the balances in NPR's checking and payroll accounts. Concentration Account B, in turn, was linked to the Holt Group's concentration account. If funds remained in Concentration Account B at the end of a business day, they would be swept into the Holt Group's concentration account. In the event of a shortfall in Concentration Account B, funds would be swept from the Holt Group's concentration account to NPR's account. 8/11/06 Whiteley Dep. at 30-35, 88-93.

NPR did not participate in SLS's cash management

system, through which SLS facilitated inter-company transfers and advances. Although the record contains evidence of two advances between NPR and two of the Holt Sons Companies that are defendants to this action,[14] said transactions were not part of the cash management system. Instead, John Whiteley explained that the advances were trade payables and receivables that were reclassified as advances for accounting purposes, and were subsequently written off pursuant to a settlement agreement with the Holt Group's bankruptcy trustee. 8/11/06 Whiteley Dep. at 26-27; OAE Ledger, Ex. 4 to App. C to the Pls.' Opp'n, at D10406-08; GMT Ledger, Ex. 19 to App. C. to the Pls.' Opp'n, at D09458; 9/5/03 Whiteley Dep. at 219-221.

c.   Management and Personnel

Once SLS acquired NPR as a client, SLS's workforce grew considerably. At one point between 1997 and 2002, SLS's employees numbered at approximately 150, approximately sixty-five of which worked on NPR's accounting and logistics functions. At the same time, NPR reduced its own logistical staff from over sixty employees to approximately twenty-seven.

There was some overlap in personnel between the two companies. SLS hired approximately twelve former NPR employees to assist with the functions that SLS provided to NPR. Former

---

[14]Those two defendants are Gloucester Marine Terminal, Inc. ("GMT") and OAE, Inc. ("OAE").

NPR employees were hired in phases, in conjunction with the
increased services that SLS provided over time. In late 1998 or
early 1999, SLS hired two employees to assist with the processing
of NPR's payroll. SLS later added former NPR employees who
assisted with cost accounting, the preparation of NPR's financial
statements, billing, and logistics. L. Holt 30(b)(6) Dep. at 48-
49; 8/11/06 Holt Jr. Dep. at 49; Whiteley 30(b)(6) Dep. at 169-
174.

Moreover, personnel from both NPR and SLS interfaced on
a frequent basis as the relationship between the companies
progressed. For instance, Leo Holt, the president of SLS,
traveled with NPR representatives in 2000 to market NPR to
potential clients. As SLS took over NPR's accounting functions,
employees from NPR met daily with SLS employees to provide
guidance. However, one SLS employee, Mark Cimaglia, testified
that he received his instructions from Mr. Whiteley, and regarded
Mr. Whiteley as his boss. L. Holt 30(b)(6) Dep. at 84-85;
Breeman Aff. ¶ 22; March 23, 2005 Dep. of Mark Cimaglia
("Cimaglia Dep."), Ex. 14 to App. A to the Pls.' Opp'n, at 72,
100-01.

### d. Compensation

The compensation arrangement between the two companies
changed over time. NPR initially paid SLS on a percentage of

22

revenue basis, as memorialized in the 1998 client services
agreement. However, in the 2000 client services agreement, the
compensation structure was changed to a weekly flat fee. Between
1998 and 2001, SLS billed NPR approximately $8.6 million in
corporate service charges. Between 1999 and 2000, NPR's payments
to SLS nearly doubled from approximately $2 million to
approximately $4 million.[15] Some of the invoices were written
off as part of the settlement agreement with the Holt Group's
bankruptcy trustee. In particular, NPR did not pay the invoices
for Navitrx, the logistics system developed by SLS, which were
written off in the bankruptcy settlement. 1/1/98 CSA at AD 7635;
1/1/00 CSA at AD 5336; L. Holt 30(b)(6) Dep. at 72; SLS Service
Charges Chart, Ex. H. to the Northen Aff; Client Service Charges,
Ex. 2.D to App. C to the Pls.' Opp'n, at 1-2.

## D.  NPR Ceases Operation and Incurs Withdrawal Liability

On December 31, 2000, NPR partially withdrew from the
Fund.  On February 23, 2001, NPR ceased all operations at the
Port of Elizabeth and completely withdrew from the Fund.  The

---

[15]The record indicates that NPR made service payments
irregularly, and in some instances, several months late. For
instance, NPR made several overdue payments to SLS on April 7 and
April 13, 1999, totaling approximately $1 million and $1.3
million, respectively. On the same dates, SLS transferred
roughly the same amounts to one of the Holt Sons Companies. Exs.
15-16 to App. C. to the Pls.' Opp'n, at AD 12787, 12792; NPR
Payments to SLS Chart, Ex. 2.A to App. C. to the Pls.' Opp'n, at
1-2.

23

Fund notified NPR that its actions had incurred withdrawal liability under ERISA and the MPPAA, but NPR failed to pay. On March 21, 2001, NPR, along with other Holt Group companies, filed for bankruptcy. Am. Compl. ¶¶ 18-19, 59; Pls.' Opp'n at 5; Holt Sons S.J. Br. at 7; see also the Court's Memorandum and Order of Sept. 14, 2004, at 2-3.

On November 29, 2001, the Fund and the plaintiffs, who were secondarily liable for NPR's withdrawal liability, reached a settlement. Under the settlement the plaintiffs paid the Fund over $14,000,000 to satisfy NPR's withdrawal liability and the Fund assigned to the plaintiffs its rights to collect withdrawal liability from NPR and its affiliates. Am. Compl. ¶ 20; Settlement Agreement and Joint Release, Ex. B to Northen Aff.

On October 10, 2002, the plaintiffs filed this suit, seeking to recover NPR's withdrawal liability from the defendants.


III. Standard of Review

A party moving for summary judgment must show that there are no issues of material fact and that judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that there are no issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary

judgment is made the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

IV. Holt Sons Defendants' Motion for Summary Judgment

The plaintiffs assert MPPAA withdrawal liability against the Holt Sons Defendants based on theories of alter ego liability and veil piercing. The Holt Sons Defendants argue that they are entitled to summary judgment on each of these theories.

With respect to alter ego liability, the defendants rely on this Court's decision in Brown v. Astro Holdings, Inc. - a related suit for withdrawal liability triggered by NPR's bankruptcy - for the proposition that an alter ego inquiry must focus on whether NPR itself was the same entity as any of the Holt Sons Companies.[16] Under this framework, the defendants argue that the facts cannot support an inference that NPR was the alter ego of any of the Holt Sons Companies.

Moreover, the defendants assert that they are entitled to summary judgment on the plaintiffs' veil piercing theory, because it is wholly derivative of the alter ego claim and cannot succeed without a predicate showing of alter ego status.

---

[16]In other words, the plaintiffs rely on Brown to argue that the alter ego test cannot be satisfied by showing that the Holt Sons Companies were alter egos of entities under common control with NPR, rather than alter egos of NPR itself.

In opposition, the plaintiffs argue as they would in a cross-motion for summary judgment, and contend that the facts establish that the Holt Sons Companies[17] were either alter egos of NPR, or of entities under common control with NPR, under three different theories: (1) SLS was the alter ego of Holt Cargo, an entity under common control with NPR; (2) the Holt Sons Companies formed part of a common "Holt Family Enterprise" with other Holt-related entities, and NPR was subsequently incorporated into this enterprise; and (3) SLS and NPR were alter egos. The plaintiffs also advance several veil-piercing arguments, which the Court will address below.

The Court will begin by discussing Brown v. Astro Holdings, Inc., in which this Court discussed the availability of alter ego and veil piercing theories of liability under the MPPAA. The Court will then analyze the plaintiffs' three theories of alter ego liability in order to determine whether summary judgment is appropriate on the alter ego question. Finally, the Court will address the plaintiffs' veil piercing arguments, as well as the plaintiffs' "controlled group" theory from their original complaint.

---

[17]Although the plaintiffs seek to establish that the Holt Sons Companies were alter egos of NPR and entities under common control with NPR, the plaintiffs focus almost exclusively on the connection between SLS and NPR, and do not advance arguments connecting other Holt Sons Companies.

26

A.    The Court's Prior Decision in Brown

In Brown v. Astro Holdings, Inc., 385 F. Supp. 2d 519 (E.D. Pa. 2005), this Court considered the question of whether a plaintiff could bring alter ego and veil-piercing claims for ERISA withdrawal liability. Brown was related to the present action insofar as it involved a claim for withdrawal liability that was triggered by NPR's bankruptcy. Although Brown involved different pension plans, it was brought against several overlapping parties that are defendants to the present suit, including Holt Sr., Orchard Hill, the Holt Sons, and seven of the Holt Sons Companies.

The facts in Brown are analogous to the present action. The plaintiffs, trustees of a multi-employer pension plan, sought to recover ERISA withdrawal liability from corporate affiliates and individual owners of NPR.  The plaintiffs did not assert that any of the defendants fit within the statutory definition of an "employer" under 29 U.S.C. § 1381(a).  Instead, the plaintiffs alleged that NPR's corporate affiliates were liable as "alter egos" of NPR, and that NPR's individual owners were liable under a veil-piercing theory.  As in the present suit, the plaintiffs contended that NPR and its corporate affiliates were so intertwined that they functioned as a single entity, which the plaintiffs similarly referred to as the "Holt Family Enterprise."

The defendants moved to dismiss, arguing that ERISA, as

a comprehensive statutory scheme, precluded remedies that were not specifically authorized by its terms. Therefore, the defendants contended that ERISA pre-empted alter ego and veil-piercing theories of liability.

Before addressing the availability of these theories, the Court outlined the distinction between "alter ego" and "veil piercing" claims.[18] The Court explained that veil piercing claims seek to impose indirect liability on an individual as a means of enforcing a judgment arising from a separate cause of action. See Peacock v. Thomas, 516 U.S. 349, 354 (1996). Veil piercing claims are often asserted against a defendant solely in its "capacity as an officer and shareholder of the liable corporation." Central States, SE and SW Areas Pension Fund v. Central Transport Inc., 85 F.3d 1282, 1286 (7th Cir. 1996). In contrast, alter ego claims allege that certain defendants "so dominated and controlled [the originally liable company] that they were the 'true employers' for purposes of ERISA liability." Central States, 85 F.3d at 1286. Therefore, whereas veil piercing claims seek to impose vicarious liability on one party for another party's debts, alter ego claims assert direct

---

[18]The Court distinguished between the two theories in the course of determining whether it had subject matter jurisdiction over the plaintiffs' claims.

liability based on a violation of ERISA.[19]  Bd. of Trs., Sheet
Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc., 212
F.3d 1031, 1038 (7th Cir. 2000).

The Court then turned to the question of whether alter
ego and veil piercing claims are available under ERISA and the
MPPAA in the context of withdrawal liability.  As noted above,
ERISA, as amended by the MPPAA, imposes withdrawal liability on
an "employer" upon a full or partial withdrawal from a multi-
employer pension plan.  29 U.S.C. § 1381(a).  The Brown
defendants argued that the statutory text of ERISA and the MPPAA
delineates the limits of withdrawal liability.  Specifically, the
statute already contains provisions imposing withdrawal liability
on entities under "common control" with the original signatory to
a pension plan.  See 29 U.S.C. § 1301(b)(1).  The defendants
argued that these common control provisions represent the balance
already struck by Congress in determining how far withdrawal
liability should extend.

After reviewing prior decisions from the Supreme Court
and the Court of Appeals for the Third Circuit and concluding

---

[19]Based on the distinction between the two theories, this
Court in Brown concluded that it had federal question
jurisdiction over the plaintiffs' alter ego claims, which alleged
a direct violation of ERISA, and supplemental jurisdiction over
the veil piercing claims, which alleged indirect violations.
Brown, 385 F. Supp. 2d at 525-26.

that none had squarely addressed this issue,[20] this Court turned

to the framework set forth in Reich v. Compton, 57 F.3d 270 (3d

Cir. 1995). In Compton, the Department of Labor sought to use an

alter ego theory to expand the reach of an ERISA provision that

prohibits certain transactions between ERISA plans and "parties

in interest." See 29 U.S.C. § 1106(a). The Court of Appeals

rejected the alter ego theory as inconsistent with congressional

intent based on several factors. First, the statutory definition

of "party in interest" was "seemingly comprehensive," and did not

include the alter ego of a "party in interest." Compton, 57 F.3d

at 277. Second, an alter ego theory would potentially overlap

with several categories already listed in the statutory

definition. Id. Finally, given the lack of a single, unified

test governing alter ego liability, a court would be required to

evaluate the policy underlying the "party in interest" provisions

in choosing the appropriate test. Such a policy determination,

however, had already been made by Congress. Id. at 277-78.

---

[20]Some cases had suggested that such remedies may not be
available. For instance, the Supreme Court has cautioned against
the judicial expansion of remedies not specifically authorized by
the text of ERISA. Great-West Life & Annuity Ins. Co. v.
Knudson, 534 U.S. 204 (2002). Moreover, some cases within this
Circuit have expressed doubts about the availability of alter ego
and veil piercing theories under the MPPAA. However, others have
assumed without deciding that such theories are available.
Compare Trustees of the Nat'l Elevator Ind. Pension, Health
Benefit and Educ. Funds v. Lutyk, 332 F.3d 188, 192-93 (3d Cir.
2003) (expressing "some doubts" about availability of veil
piercing claims under ERISA) with Bd. of Trs. v. Foodtown, Inc.,
296 F.3d 164 (3d Cir. 2002) (reversing dismissal of plaintiff's
claim alleging alter ego theory for MPPAA withdrawal liability).

Applying the framework set forth in Compton, this Court
concluded that ERISA and the MPPAA do permit a plaintiff to seek
withdrawal liability under alter ego and veil piercing theories.
The Court began its analysis with the alter ego theory, and
turned to the statutory text of the MPPAA. The Court noted that,
in the context of MPPAA withdrawal liability, an alter ego claim
alleges that the defendant is the same entity as the "employer"
liable for withdrawal. However, the MPPAA contains no definition
of an "employer," and this definition has instead been "left to
the courts." Korea Shipping Corp. v. New York Shipping Ass'n-
Int'l Longshoremen's Ass'n Pension Trust Fund, 880 F.2d 1531,
1536 (2d Cir. 1989).[21] Accordingly, the Court reasoned that, in
contrast to Compton, an alter ego theory would neither conflict
nor overlap with any existing definition of an "employer."
Although a court applying an alter ego theory would have to
choose between alternate tests, such a determination would not
revisit a choice already made by Congress. Instead, when
Congress leaves open a statutory term, a court must borrow from
traditional common law, so long as the common law is consistent
with ERISA's and the MPPAA's provisions and policies. See IUE
AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118,

---

[21]Most courts that have considered the issue have followed
the lead of the Second Circuit and have held that an "employer"
under the MPPAA is a "person who is obligated to contribute to a
plan either as a direct employer or in the interest of an
employer of the plan's participants." Korea Shipping, 880 F.2d
at 1537.

31

124. (3d Cir. 1988)

The Court determined that interpreting an "employer" subject to withdrawal liability to include an alter ego of the employer was consistent with federal common law, as well as with ERISA and the MPPAA. Alter ego liability is well-recognized under federal common law. Moreover, the purpose of the MPPAA is to protect the solvency of multi-employer pension plans. Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Farber Corp. Of Cal., 522 U.S. 192, 196 (1997). The Court reasoned that including alter egos of "employers" would prevent a company from avoiding liability by shifting assets, and would thereby further this policy. Finally, because alter ego liability is predicated on the alter ego being "essentially the same entity" as the employer, the Court reasoned that permitting an alter ego theory would not unduly expand withdrawal liability.

However, based on the same analysis set forth in Compton, the Court reasoned that the MPPAA does not permit a plaintiff to allege that a defendant is the alter ego of a trade or business under common control with a statutory employer. Unlike the term "employer," the term "common control" is defined in detail by regulations promulgated by the Internal Revenue

Service.[22]  Specifically, companies are held to be under common
control when they are linked by either a parent corporation or a
group of five or fewer individuals who control 80% of a company's
voting shares or profits.  26 C.F.R. § 1.414(c)-2.  The Court
held that allowing liability to be imposed on an alter ego of an
entity under common control would add an overlapping category to
this existing list, and would upset the "carefully crafted and
detailed legislative scheme" set out by the MPPAA.  See Compton,
57 F.3d at 277.

        The Court then turned to the availability of a veil
piercing theory under the MPPAA.  The Court noted that, in
contrast to the alter ego theory, veil piercing does not focus on
whether the defendant and the employer are the same entity,
thereby implicating the definition of "employer," but rather
whether the defendant should be responsible for the employer's
liability.  Applying the reasoning set forth in Compton, the
Court identified a potential conflict between veil piercing and
the common control provisions of the MPPAA.  First, the
regulations defining a trade or business under common control
with an employer are "seemingly comprehensive."  Moreover, a veil
piercing theory could overlap with the regulations, because both

_____

        [22]29 U.S.C. § 1301(b)(1) specifically authorizes the Pension
Benefit Guaranty Corporation ("PBGC") to issue regulations
defining "common control" in a manner consistent with existing
Internal Revenue regulations.  The PBGC's authorized regulations,
in turn, incorporate by reference the IRS regulations codified at
26 C.F.R. §§ 1.414(c)-1 to 1.414(c)-5.

"look to the degree to which one corporation exercises effective
control over another." Brown, 385 F. Supp. 2d at 533.

Nonetheless, the Court identified a significant area in
which a veil piercing analysis and the common control provisions
do not overlap. Specifically, the common control provisions do
not apply to individuals, but only to "trades or businesses." 29
U.S.C. § 1301(b). Therefore, the provisions do not overlap with
claims that seek to pierce a corporate veil to hold individuals
liable. Moreover, based on its study of the MPPAA's legislative
history, the Court reasoned that the omission of individuals from
the common control provisions likely did not reflect a
congressional decision to exclude individuals from liability.[23]
Accordingly, the Court concluded that the MPPAA did not preclude
a veil piercing theory in the context of withdrawal liability, at
least as to individual defendants.

In reaching these holdings, this Court did not consider
what test should be applied with respect to either an alter ego
or veil piercing theory. The Court revisits that question in the
present action.

---

[23]Instead, the Court determined that the common control
provisions likely reflected the narrow purpose of preventing
companies from avoiding liability by dividing themselves into
separately incorporated entities.

34

B.   Plaintiffs' Theories of Alter Ego Liability

The plaintiffs advance three theories of alter ego liability to hold the Holt Sons Companies responsible for NPR's withdrawal liability.  These arguments primarily seek to connect SLS, one of the Holt Sons Companies, to various entities owned by the Holt Group and Holt Sr.

1.   Theory I: SLS is Liable as the Alter Ego of Holt Cargo, An Entity Under Common Control with NPR

Under the plaintiffs' first theory, SLS is responsible for NPR's withdrawal liability because SLS and Holt Cargo were alter egos,[24] and Holt Cargo was under common control with NPR within the meaning of 29 U.S.C. § 1301(b)(1).  Therefore, SLS should be liable as the alter ego of an entity under common control with NPR.

The plaintiffs acknowledge that this theory is in conflict with Brown, where the Court held that withdrawal liability cannot be imposed on the alter ego of an entity under common control.  However, the plaintiffs urge the Court to reconsider its holding in Brown and reach a different result for three reasons.  First, the plaintiffs argue that Compton, a case on which this Court relied in Brown, conflated the concepts of

_____

[24]The plaintiffs contend that SLS and Holt Cargo were alter egos because SLS was a "mere continuation" of Holt Cargo's finance and accounting department.  The plaintiffs argue that Holt Cargo provided start-up capital, facilities, equipment, management, and customers to SLS.

alter ego and veil piercing in the course of its analysis.[25]
According to the plaintiffs, the Compton court's characterization
of alter ego claims may have affected its outcome, thereby
undermining this Court's reliance on the case in Brown.

Second, the plaintiffs argue that agency regulations
are less indicative of congressional intent than statutory text.
Whereas the "party in interest" provisions at issue in Compton
are defined in the statutory text, the common control provisions
at issue in Brown are left undefined, and instead have been
interpreted by agency regulations.  Therefore, the Court should
not infer congressional intent to exclude the alter ego of an
entity under common control based on agency regulations.

Finally, the plaintiffs argue that Brown flouts the
basic policies of the MPPAA.  The plaintiffs argue that
interpreting "common control" to include alter egos of such
entities would ensure that employers cannot avoid their pension
liabilities by manipulating the corporate form, and would thereby
further the policies underlying the MPPAA.

The Court concludes that its prior decision in Brown
best balances the competing interests and policies at play in the
context of withdrawal liability, and should govern this case.
The Court begins by noting that its analysis is unaffected by the

----

[25]The plaintiffs argue that the Compton court characterized
the alter ego theory in question as analogous to a veil piercing
theory.

plaintiffs' contention that the Compton court conflated alter ego
and veil piercing theories. Compton established an analytical
framework for determining whether a particular theory of
liability is available under ERISA. The factors that the Compton
court considered in evaluating the availability of an alter ego
theory were independent of the Court's precise characterization
of that claim. In other words, the outcome in Compton was not
based on the Court's particular understanding of alter ego
liability. Instead, Compton rejected the DOL's alter ego theory
because it would overlap and conflict with existing definitions
of a "party in interest," and would invite courts to revisit
policy decisions already made by Congress. See Compton v. Reich,
57 F.3d 270, 276-78 (3d Cir. 1995).

Additionally, although this Court in Brown did
distinguish between alter ego and veil piercing claims, it
nonetheless utilized the Compton framework to determine the
availability of each theory under ERISA and the MPPAA. If the
plaintiffs' logic is to be followed, then this Court's decision
in Brown would have been incorrect regardless of how the Compton
court understood the alter ego theory. For example, the
plaintiffs here argue that the Court should not have relied on
Compton with respect to the alter ego theory, because Compton was
in reality analyzing a veil piercing theory. By that same logic,
if Compton had analyzed a "true" alter ego theory, then this

37

Court would have been misguided if it used the Compton framework to assess the availability of veil piercing under ERISA. The Court disagrees that the Compton court's characterization of the claim is of relevance. Instead, this Court continues to be persuaded that the Compton framework is an appropriate means of evaluating the availability of each theory under the MPPAA.

The Court also disagrees with the argument that the regulations defining "common control" do not reflect congressional intent. The MPPAA specifically authorizes the Pension Benefit Guaranty Corporation ("PBGC") to issue regulations defining "common control" as it is used in § 1301. However, the statutory text of the MPPAA instructs that the PBGC regulations interpreting "common control" must be "consistent and coextensive with" regulations promulgated by the Treasury Department under section 414(c) of the Internal Revenue Code ("IRC"), 26 U.S.C. § 414(c). 29 U.S.C. § 1301(b)(1). The PBGC has in turn issued regulations that expressly incorporate the regulations defining "common control" issued by the Internal Revenue Service. See 29 C.F.R. §§ 4001.1-4001.3. Therefore, it cannot be said that Congress gave free reign to the PBGC to issue its own regulations. Instead, the statutory text explicitly envisions regulations that are consistent with existing definitions of "common control."

Moreover, the Court's decision in Brown was not based

solely on the comprehensiveness of the agency regulations at issue. Instead, the Court arrived at its decision, mindful of "ERISA's comprehensiveness and the complicated balance it represents among competing interests." Brown, 385 F. Supp. 2d at 529. A principal purpose of ERISA, as amended by the MPPAA, is to protect plan participants and their beneficiaries, and to prevent "the adverse consequences that result when individual employers terminate their participation or withdraw" from multiemployer pension plans. Einhorn v. M.L. Ruberton Constr. Co., 2011 U.S. App. LEXIS 1171, at *17 (3d Cir. Jan. 21, 2011) (citations omitted). Because ERISA and the MPPAA are remedial statutes, they should be "liberally construed in favor of protecting the participants in employee benefit plans." Barker & Williamson, Inc., 788 F.2d at 127. However, because ERISA represents a "carefully crafted and detailed enforcement scheme," the Supreme Court has cautioned against the judicial expansion of remedies not specifically authorized by ERISA's text. Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209 (2002) (citations omitted).

The Court remains convinced that interpreting the MPPAA to permit a claim that a defendant is the alter ego of a statutory employer, but not of an entity under common control with a statutory employer, best balances these policies. Interpreting an "employer" to include its alter egos furthers the

39

very policy goals that the plaintiffs highlighted above.
Specifically, holding the alter ego of an "employer" responsible
for withdrawal liability would prevent companies from avoiding
their responsibilities merely by shifting assets to their alter
egos.  At the same time, because an alter ego theory requires a
showing that the alleged alter ego is essentially the same entity
as the employer, the theory is sufficiently narrow so as not to
expand unduly the reach of withdrawal liability.  As a
consequence, the Court's interpretation of "employer" can be
harmonized with the need to construe ERISA and the MPPAA
liberally, while avoiding the undue judicial expansion of
remedies.

In contrast, interpreting "common control" to include
the alter egos of entities under common control cannot be
harmonized with these policy considerations.  As described in
detail above, an alter ego theory both overlaps and conflicts
with the common control provisions as interpreted by the PBGC and
IRS.  Interpreting "common control" as the plaintiffs request
would therefore not only represent a further judicial expansion
of remedies, but would also lead to unpredictable standards of
liability.  The Court therefore concludes that, with respect to
entities under common control, the MPPAA sets out a "carefully
crafted and detailed legislative scheme" whose balance of
competing interests courts "should not attempt to adjust."  See

Compton, 57 F.3d at 277 (citation and internal quotation omitted).

In view of the foregoing, the Court reiterates its decision in Brown and concludes that the plaintiffs' first theory of alter ego liability is untenable. Because the plaintiffs' theory is barred as a matter of law, the Court will not address the question of whether SLS and Holt Cargo were alter egos.

> 2. Theory II: The Holt Sons Companies Formed a Common Enterprise with Holt Cargo and Other Holt-Related Entities, Into Which NPR was Integrated

The plaintiffs argue that their second and third theories of alter ego liability must be read in tandem. Both theories are premised on the "single integrated enterprise" or "single employer" doctrine, a test that originated in the labor law context, and which is employed by various circuits to determine whether two employers should be viewed as a "single employer," or alter egos, for purposes of MPPAA withdrawal liability.[26]  The plaintiffs urge the Court to adopt this doctrine, but the defendants argue in favor of another test based on federal common law principles. However, neither test has been explicitly adopted by the Court of Appeals for the Third Circuit

---

[26]In addition, the plaintiffs make reference to the "disguised continuance" or "alter ego" doctrine, a similar test derived from labor law that is used to determine when two entities should be regarded as the same. The Court will discuss the distinction between these doctrines below.

in the MPPAA context. In this section, the Court will not decide
which test should apply. Instead, it will analyze whether the
plaintiffs' various legal theories remain viable in light of this
Court's holding in Brown.

In their second theory, the plaintiffs focus on the
time period before NPR was acquired by Holt Sr. in 1997. The
plaintiffs argue that during this time, the Holt Sons Companies
operated as part of a common enterprise with the companies owned
by Holt Sr. and his affiliates, and all of these Holt-related
entities formed what the plaintiffs describe as the "Holt Family
Enterprise." The plaintiffs contend that SLS served as the hub
linking all of the Holt-related entities together, because of the
financial control that SLS exerted through its cash management
system. The plaintiffs urge the Court to view this "Holt Family
Enterprise" as a single employer during the time before NPR was
acquired. At oral argument, the plaintiffs described this second
theory as a "predicate fact" to proving their third theory. Tr.
of Oral Arg. on Dec. 13, 2007, at 7-8.

Using their second theory as a backdrop, the plaintiffs
argue in their third theory that NPR was seamlessly integrated
into the "Holt Family Enterprise" following its acquisition in
1997. The plaintiffs contend that NPR was integrated into the
enterprise by virtue of its relationship with SLS, pursuant to
which NPR transferred its financial operations to the latter.

42

The plaintiffs argue that NPR and SLS became alter egos, both as a consequence of their relationship with each other and their broader roles within the enterprise. Then, to connect the remaining Holt Sons Companies to NPR, the plaintiffs argue that NPR became the alter ego of the "Holt Family Enterprise" taken as a unified whole.[27] However, the plaintiffs do not advance significant analysis to connect the remaining Holt Sons Companies to NPR. Instead, the plaintiffs focus almost exclusively on the relationship between NPR and SLS in their third theory.

The Court concludes that the plaintiffs' legal arguments run partially afoul of Brown. Pursuant to Brown, the plaintiffs cannot prevail on an alter ego claim by establishing that the Holt Sons Companies were alter egos of entities under common control with NPR. It follows that an argument that NPR and SLS were alter egos based not only on their own relationship, but also based on their relationships with other entities in the broader "Holt Family Enterprise," is analogous to the theory proscribed by Brown. Similarly, a theory alleging that NPR was the alter ego of the "Holt Family Enterprise" as a whole, rather than of its individual constituent parts, is similarly precluded by Brown. Both arguments attempt to supplement the requisite direct relationship between NPR and the Holt Sons Companies by

---

[27]Specifically, the plaintiffs argue that the "Holt Family Enterprise" formed a "single enterprise" with NPR following its acquisition. Tr. of Oral Arg. on Dec. 13, 2007, at 6.

focusing on relationships between the Holt Sons Companies and entities within NPR's "controlled group." In that respect, both arguments give rise to the same issues that the Court identified in Brown. These arguments would permit a plaintiff to connect an alleged alter ego to a statutory employer indirectly, by way of an intermediary sharing common control. However, Brown requires a direct showing that an alleged alter ego is "essentially the same entity as the employer." Brown, 385 F. Supp. 2d at 532.[28]

To be consistent with Brown, therefore, a viable alter ego theory must focus on whether any of the Holt Sons Companies was an alter ego of NPR. This test cannot be satisfied by relying on relationships between the Holt Sons Companies and entities under common control with NPR, or between NPR and non-Holt Sons Companies. As a consequence, the Court need not determine whether the Holt-related entities operated as a single employer for ERISA purposes prior to the acquisition of NPR. Instead, the appropriate inquiry focuses on whether NPR and SLS were alter egos, a point which the plaintiffs argue in their third theory.

---

[28]The plaintiffs cite to Angelidis v. Piedmont Management Co., Inc., 1994 U.S. Dist. LEXIS 6877 (May 23, 1994, D.N.J. 1994), in support of their argument that the Court must consider the relationship between all Holt-related entities, not just between the Holt Sons Companies and NPR. However, Angelidis arose in the context of the Age Discrimination in Employment Act ("ADEA"), not ERISA withdrawal liability, and is therefore factually and legally distinguishable from this case.

44

### 3.   Theory III: NPR and SLS Were Alter Egos

The remaining inquiry is whether NPR and SLS were alter egos of each other.  The defendants have moved for summary judgment on this ground, arguing that no reasonable fact finder could conclude that SLS, or any of the remaining Holt Sons Companies, is an alter ego of NPR.

Before determining whether summary judgment is appropriate, the Court must address the proper standard to be applied in analyzing whether entities are alter egos.  The Court of Appeals for the Third Circuit has not explicitly adopted a test for alter ego in the context of MPPAA withdrawal liability.  Moreover, although this Court in Brown determined that alter ego claims were permissible under the MPPAA, it declined at that juncture to resolve the question of the appropriate test.

The plaintiffs rely on the "single integrated enterprise," or "single employer" test, which is derived from labor law and was articulated by the Court of Appeals for the Third Circuit in NLRB v. Browning-Ferris Industries of Pennsylvania, Inc., 691 F.2d 1117 (3d Cir. 1982).  Although the plaintiffs acknowledge that this test has not been adopted by this Circuit in the context of the MPPAA, they urge this Court to follow the lead of other circuits, which have expanded the single employer test to ERISA and the MPPAA.

In contrast, the defendants argue that the appropriate

test for alter ego claims is found in federal common law.  The
common law alter ego test invokes factors that derive from
traditional veil piercing claims, in which a plaintiff seeks to
impose indirect liability on a person or entity controlling a
corporation.  See, e.g., Trs. of the Nat'l Elevator Indus.
Pension, Health Benefit, and Educ. Funds v. Lutyk, 332 F.3d 188
(3d Cir. 2003); Bd. of Trs. v. Foodtown, Inc., 296 F.3d 164 (3d
Cir. 2002).  The Third Circuit has not explicitly adopted the
common law test for alter ego claims under the MPPAA.

There is no clear test, therefore, for alter ego claims
under the MPPAA in the Third Circuit.  The Court harbors some
doubts about the applicability of each test in the context of the
MPPAA, but the Court need not decide which test is appropriate,
because it concludes that the outcome is the same under each.


a.    The Single Employer Test

The "single employer," or "single integrated
enterprise" doctrine, was developed by the National Labor
Relations Board ("NLRB") to determine whether separate companies
should be considered one employer for purposes of the National
Labor Relations Act ("NLRA").  Parklane Hosiery Co., Inc., 203
NLRB 597, 612 (1973).  As articulated by the Court of Appeals for
the Third Circuit in Browning-Ferris, this test looks to whether
"two nominally separate entities are actually part of a single

integrated enterprise so that, for all purposes, there is in fact only a 'single employer.'" Browning-Ferris, 691 F.2d at 1122. In answering this question, the test looks at four factors: (1) functional integration of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership. Id. Among these factors, "no single factor is dispositive; rather, single employer status under this test 'ultimately depends on all the circumstances of the case.'" Pearson v. Component Technology Corp., 247 F.3d 471, 485-86 (3d Cir. 2001) (citation omitted). The heart of the inquiry is whether separate corporations are "in truth ... but divisions or departments of a single enterprise" lacking the "arm's length relationship found among unintegrated companies." Browning-Ferris, 691 F.2d at 1122.

The Third Circuit has explained that because the "single employer" test was developed in the labor law context, it "concerned itself only with those aspects of corporations having a direct relevance to labor relations." Pearson, 247 F.3d at 485-86. As a consequence, the test leaves out traditional alter ego and veil piercing concerns such as the non-payment of dividends, because "such aspects of a corporation's finances are not as directly related to management's labor policy as are other aspects of corporate functioning." Id. at 486. The test, which focuses more on "economic realities as opposed to corporate

formalities," has been described as "demonstrably easier on plaintiffs than traditional veil piercing."[29] Id.

In Pearson, the Court explained that the single employer test has been expanded by courts in other circuits to additional employment contexts, including the Labor Management Relations Act and Title VII. Id. Additionally, the plaintiffs cite to cases from other circuits that have applied a similar labor-related test to claims under ERISA, and in some cases, to claims under the MPPAA in particular.

For instance, the plaintiffs cite to Massachusetts Carpenters Central Collection Agency v. Belmont Concrete Corp., 139 F.3d 304 (1st Cir. 1998), an action to recover delinquent pension fund contributions from a corporate entity, on the basis that the entity was the alter ego of the primarily liable corporation. In analyzing this claim, the First Circuit applied a modified version of the "single employer" test, explaining that "the alter ego jurisprudence developed in cases brought under the National Labor Relations Act ... is applicable in cases brought under ERISA where the basis for imposition of liability is also

---

[29]Much of the case law applying alter ego and veil piercing doctrines refers to the two terms interchangeably.

48

the alter ego doctrine." Id. at 306.[30] The Court disapproved of a test derived from traditional veil-piercing factors, and concluded that application of alter ego jurisprudence from the labor law context "more fully serves the policies that underlie the MPPAA and ERISA." Id. at 308.

Other circuits have also applied either the "single employer" test or the related Belmont Concrete test to analyze alter ego claims under ERISA. For instance, the Second Circuit applied a test derived from labor law, similar to the one employed in Belmont Concrete, in the context of MPPAA withdrawal liability. Specifically, the Second Circuit applied the labor test in determining whether withdrawal liability should be imposed on corporate affiliates as alter egos of a bankrupt statutory employer.[31] N.Y. State Teamsters Conference Pension and Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 649 (2d Cir. 2005). Courts within the Seventh Circuit have applied the four-

---

[30]The Court in Belmont Concrete applied a modified version of the Browning-Ferris test, and focused on the following factors: continuity of ownership, management, business purpose, operation, equipment, customers, supervision, and anti-union animus. Belmont Concrete, 139 F.3d at 308. In the labor context, this modified test is sometimes referred to as the "alter ego doctrine." Although it is related to the "single employer" test, it is not identical, and the tests are applied in different contexts. The Court will distinguish between these tests below. See Stardyne, Inc. v. NLRB, 41 F.3d 141 (3d Cir. 1994) (distinguishing between two labor tests).

[31]The Court focused on commonality of management, business purpose, operations, equipment, customers, supervision and ownership. N.Y. State Teamsters, 426 F.3d at 649.

factor "single employer" doctrine in the context of claims for delinquent contributions under ERISA.  See, e.g., Central States, Se. And Sw. Areas Pension Fund v. George W. Burnett, Inc., 451 F. Supp. 2d 969 (N.D. Ill. 2006).

As noted above, the "single employer" doctrine has not been adopted by the Third Circuit in the context of ERISA.[32] However, the plaintiffs urge the Court to adopt this test both in view of other circuits' precedent, and because the test furthers the MPPAA's policies by ensuring that employers cannot avoid withdrawal payments by fractionalizing into multiple entities, which are in reality a single employer.

The Court is hesitant to import the "single employer" doctrine into the context of the MPPAA.  In Nesbit v. Gears Unlimited, Inc., 347 F.3d 72 (3d Cir. 2003), the Court of Appeals for the Third Circuit declined to extend the NLRB test to the Title VII context in an employment discrimination suit.  The Court reasoned that Title VII and the NLRA are animated by different policies.  Specifically, in the labor context, the test was designed to protect the collective bargaining rights of employees.  If two entities satisfy the "single employer" test, the NLRB may decide a particular labor dispute, and the companies

---

[32]In an unpublished opinion, the Court of Appeals for the Third Circuit declined to decide this question.  See Lafata v. Raytheon Co., 147 Fed. Appx. 258, 262 (3d Cir. 2005) ("We need not consider whether this "single employer" doctrine is applicable in the context of a federal employment statute like ERISA where employer participation is voluntary.").

will likely be required to submit to collective bargaining. In contrast, under Title VII, a defendant deemed to be an "employer" may be subject to liability. Therefore,

> [b]ecause the NLRA and Title VII ask whether entities are a single enterprise for different reasons, it does not follow that the NLRB's test is any more relevant to Title VII cases than any of the other tests for determining whether two companies should be regarded as one.

Id. at 85.

The Court is also concerned that adopting the NLRB's "single employer" test could undermine the statutory framework established by ERISA and the MPPAA. In Brown, this Court limited the availability of alter ego claims under the MPPAA to alter egos of an "employer," so as to avoid a conflict with the MPPAA's common control provisions. Moreover, in interpreting the term "employer," this Court explained that it "must borrow from traditional common law to develop the necessary federal common law for interpreting the statutory language," while mindful of ERISA's policy goals. Brown, 385 F. Supp. 2d at 532 (quoting IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 124 (3d Cir. 1988)). However, the "single employer" test is not a product of federal common law, but rather was developed by the NLRB, a regulatory agency not tasked with interpreting ERISA. Therefore, Congress may not have envisioned that a labor-related test developed by another agency would be imported into ERISA.

Nonetheless, recent case law suggests that tests

51

derived from the labor law context may be appropriate in ERISA cases. In Einhorn v. M.L. Ruberton Constr. Co., 2011 U.S. App. LEXIS 1171 (3d Cir. Jan. 21, 2011), the Court of Appeals for the Third Circuit explicitly approved of a labor-derived test to analyze a claim for ERISA successor liability.[33]

Much like the "single employer" test, the test adopted in Einhorn was originally developed in context of the NLRA. Moreover, the test, which involved a balancing of the equities, was in some respects more lenient than the federal common law rule. Id. at *9-10.

In adopting the test, the Court of Appeals noted that the labor test had been expanded to other contexts within the Third Circuit, including Title VII employment discrimination claims. Id. at *14-15. The Court also noted that the policies underlying ERISA and the MPPAA are "no less important, and no less compel the imposition of successor liability than do the policies animating the NLRA [or] Title VII." Id. at *16 (citations omitted). The Court explained that the principal policy of ERISA and the MPPAA is to protect plan participants and their beneficiaries. In Einhorn, the seller of assets' failure to pay contributions resulted in the loss of health insurance to fifty-three workers. The Court reasoned that application of the

---

[33]The plaintiffs sought to recover unpaid pension contributions from a purchaser of assets, under the theory that the purchaser was a successor in interest to the seller, which had failed to make contributions amidst financial difficulties.

52

labor test would further the MPPAA's fundamental policy concerns.
Id. at *16-18.

Nonetheless, there exist distinctions between the
present case and Einhorn. In contrast to the labor test at issue
in Einhorn, the Court of Appeals for the Third Circuit has been
more hesitant to expand the "single employer" doctrine to other
contexts. See Nesbit, 347 F.3d at 85. Moreover, the policy
concerns in the present case do not parallel those in Einhorn.
Whereas Einhorn arose in the context of unpaid contributions that
resulted in harm to plan participants, there is no indication in
the present case that any ERISA plan participants have gone
unpaid. In contrast, the plaintiffs have already paid the
withdrawal liability pursuant to a settlement agreement with the
Fund. Therefore, the issue in this case who should ultimately be
held responsible for the withdrawal liability.

The Court need not resolve these doubts, because it
concludes that the outcome of the present action is the same
under both the "single employer" and common law tests. Before
applying the "single employer" test, the Court notes two
variations to that test in the case law.

In Stardyne, Inc. v. NLRB, 41 F.3d 141 (3d Cir. 1994),
the Court of Appeals for the Third Circuit explained the two
labor contexts in which courts look to determine whether two
entities should be considered the same employer. Most commonly,

this inquiry is undertaken in the so-called "double-breasted" scenario, "where two entities *concurrently* perform the same function and one entity recognizes the union and the other does not." Id. at 152 (emphasis in original). In the "double-breasted" scenario, courts apply the four Browning-Ferris factors outlined above. Id.

Courts apply similar, but slightly different, factors in the context of a "disguised continuance," which arises when a new legal entity has replaced a predecessor. Id. In such a case, courts look to determine whether there has been a change in ownership or simply a "disguised continuance." The heart of the inquiry is whether "the two employers are the same business in the same market." Id. at 151 (citations omitted). In conducting this inquiry, courts focus on whether the new and old employers share "substantially identical management, business purpose, operation, equipment, customers and supervision, as well as ownership." Trafford Distrib. Ctr. v. NLRB, 478 F.3d 172, 179 (3d Cir. 2007) (citations omitted). Moreover, anti-union animus, or an intent to avoid the NLRA, is an important, but not essential, factor in this inquiry. Stardyne, 41 F.3d at 151 (citations omitted). Courts refer to the test applied in the "disguised continuance" context as the "alter ego doctrine."[34]

---

[34]In order to avoid confusion with the common law alter ego doctrine that the Court will discuss below, the Court will refer to these factors as the "disguised continuance" test.

Trafford, 478 F.3d at 179.

These tests are related, and courts have not always respected the distinction between them, but instead have sometimes applied the factors associated with the "disguised continuance" scenario to the "double-breasted" situation. See N.Y. State Teamsters, 426 F.3d at 649 (applying "disguised continuance" factors in context of double-breasted employers); Belmont Concrete, 139 F.3d at 307 (noting that both parallel and successor scenarios were present, and applying "disguised continuance" factors).

Both parties agree that this action presents a "double-breasted" scenario. The plaintiffs argue that NPR and SLS functioned as a single employer during the course of NPR's operations, and their analysis revolves around the four Browning-Ferris factors discussed above. At oral argument, the defendants agreed that the "double-breasted" scenario is at issue in this case. Tr. of Oral Arg. on Dec. 13, 2007, at 21-22.

The Court turns to the four Browning-Ferris factors to determine whether a reasonable finder of fact could conclude that NPR and SLS were a "single employer."


i.    Interrelation of Operations

In determining whether two entities have interrelated operations, courts within this Circuit have considered such

55

factors as whether the entities share equipment, funds, personnel, and office space. Limbach Co. v. Sheet Metal Workers Int'l Ass'n, 949 F.2d 1241, 1260 (3d Cir. 1991); NLRB v. Al Bryant, Inc., 711 F.2d 543, 551 (3d Cir. 1983).[35] Courts within other circuits have focused on similar factors, including whether employees of nominally separate employers are paid by the same entity. See, e.g., Central States, Se. and Sw. Areas Pension Fund v. George W. Burnett, Inc., 451 F. Supp. 2d 969, 976 (N.D. Ill. 2006).[36]

The defendants argue that the facts cannot support an inference that NPR and SLS shared interrelated operations. The defendants emphasize that NPR and SLS maintained separate business operations and business purposes. According to the defendants, an overlap in financial operations, without more, is

---

[35]In Al Bryant, for instance, the Court of Appeals affirmed the NLRB's finding that several entities were a "single employer" where one entity was a mere "operational shell" whose expenses were paid by a dominant entity, and whose only assets were a single van and some office equipment. 711 F.2d at 551. See also Trafford Distrib. Ctr. v. NLRB, 478 F.3d 172, 176 (3d Cir. 2007) (finding substantial identity of equipment and customers in "disguised continuance" context, where successor and predecessor entities used "same exact equipment" and all of successor's initial customers had been predecessor's).

[36]Some courts have explicitly considered whether the entities in question share the same "business purpose." However, courts that have applied this factor have done so using the "disguised continuance" test, even if the case in question arose in the "double-breasted" context. See N.Y. State Teamsters, 426 F.3d at 649 (discussing business purpose as important factor); Belmont Concrete, 139 F.3d at 309 (examining business purpose where alleged alter ego was both parallel and successor company).

insufficient to satisfy this factor.

In contrast, the plaintiffs argue that NPR transferred its financial operations to SLS in a manner that was not consistent with arms length dealings, and which allowed SLS to assume financial control of NPR. In support of this argument, the plaintiffs cite to the following facts: (1) SLS performed accounting, payroll and insurance purchasing functions for NPR, and in so doing had access to NPR's bank accounts; (2) SLS provided services to NPR that were not commensurate with the terms of the parties' written agreements; (3) NPR and SLS shared equipment, such as the IBM 3090 computer system, and employees, such as Leo Holt, who traveled with NPR representatives in a marketing function; (4) NPR never paid SLS for the Navitrx logistics system, and yet simultaneously paid nearly double in client service fees; and (5) NPR paid its invoices irregularly and in some instances, several months after they were billed.[37]

The plaintiffs contend that all of these facts reveal a lack of arms length dealing between NPR and SLS, which supports

_____

[37]The plaintiffs advance additional arguments that seek to connect NPR and SLS to the broader "Holt Family Enterprise" by establishing their status as divisions of a unified entity that provided shipping, stevedoring, warehousing, trucking and logistics services. See Pls.' Opp'n at 76. The Court will disregard these arguments, because it has already established that the proper analysis must focus on whether NPR was the same entity as SLS or other Holt Sons Companies.

57

an inference of interrelated operations.[38]  Moreover, the plaintiffs argue that, at a minimum, the Court must deny summary judgment because there exist material disputed facts over whether NPR and SLS dealt with each other at arms length.  See Pls.' Opp'n at 78-79.

The Court disagrees that there are material facts in dispute.  Whether NPR and SLS operated at arms length is not a fact that is in dispute; it is an inference that the plaintiffs wish the Court to draw from the undisputed facts.  The Court concludes that the undisputed facts, taken in the light most favorable to the plaintiffs, do not support an inference of interrelated operations.

First, the record does not support the inference that SLS took control of NPR's financial functions.  Instead, the facts are consistent with the general outsourcing of financial and accounting functions.  As the plaintiffs acknowledge, SLS provided accounts payable, accounts receivable and payroll functions for NPR.  In addition, SLS provided sales and marketing assistance, and purchased insurance for NPR.  However, nothing in the record suggests that SLS had access to NPR's funds for its

---

[38]In addition to the facts cited above, the plaintiffs rely on the opinion of their expert, Louis R. Pichini, who concluded that the client services agreements between NPR and SLS did not contain arms length clauses.  Coupled with NPR's non-payment for the Navitrx system, Mr. Pichini concluded that NPR and SLS were financially integrated.  September 15, 2006, Expert Report of Louis R. Pichini ("Pichini Report"), Ex. 2 to App. B to the Pls.' Opp'n, at 24-26.

own purposes, or that SLS could use NPR's funds to pay the bills of SLS's other clients.[39]

With respect to the latter question - whether SLS had access to NPR's funds for the benefit of its other clients - the plaintiffs argue throughout their brief that NPR participated in SLS's cash management system. As evidence of NPR's participation, the plaintiffs point to two advances between NPR and two of the Holt Sons Companies,[40] as well as the fact that on one occasion, NPR made overdue service payments to SLS, and SLS subsequently transferred roughly the same amounts to one of the Holt Sons Companies.[41]

No reasonable juror could conclude on the basis of these facts that NPR participated in the cash management system.

---

[39]Indeed, the specific portions of the record on which the plaintiffs rely undermine their argument that SLS controlled NPR's financial operations. For instance, the plaintiffs cite to the deposition of Mark Cimaglia in support of their argument that SLS had virtually unlimited access to NPR's bank accounts. However, Mr. Cimaglia testified only that SLS provided "payroll" and "general ledger services" that were, to his knowledge, no different from the services that SLS provided to its other customers. Moreover, Mr. Cimaglia testified that NPR maintained its own cash manager and accounts payable department. Cimaglia Dep. at 182, 219.

[40]As explained above, the plaintiffs identified advances between NPR and Gloucester Marine Terminal, Inc., and OAE, Inc.

[41]Specifically, NPR made overdue payments to SLS on April 7 and April 13, 1999, totaling approximately $1 million and $1.3 million, respectively. On the same dates, SLS transferred roughly the same amounts to one of the Holt Sons Companies. Exs. 15-16 to App. C. to the Pls.' Opp'n, at AD 12787, 12792; NPR Payments to SLS Chart, Ex. 2.A to App. C. to the Pls.' Opp'n, at 1-2.

John Whiteley, SLS's controller, testified that NPR did not participate in the cash management system. With respect to the two advances identified by the plaintiffs, Mr. Whiteley explained that the advances were trade payables and receivables that were reclassified as advances for accounting purposes. The plaintiffs have offered no arguments or facts to rebut this explanation.

Similarly, the fact that NPR's payment of overdue invoices corresponded with a transfer from SLS to a Holt Sons Company cannot support the inference that NPR participated in the cash management system. The record contains no facts suggesting that NPR and SLS coordinated with respect to the payment of these invoices, or that SLS's subsequent transfer of funds was not part of its standard procedure when invoices are paid.

Relatedly, the plaintiffs argue that the payment history between NPR and SLS establishes interrelated operations, but the Court concludes that the underlying facts do not support such an inference. Although NPR paid its invoices several months late, this fact is consistent with a general client service relationship. The record also indicates that most of SLS's service charge invoices were eventually paid in full.[42] The fact that NPR never paid SLS for the Navitrx system, and yet simultaneously paid nearly double in client service fees, also fails to support an inference that the parties did not operate at

---

[42]See October 6, 2006, Dep. of Louis R. Pichini ("Pichini Dep."), Ex. 19 to Holt Sons S.J. Br., at 373-74.

arms length. The plaintiffs argue that NPR paid these increased service fees in exchange for no additional services. This argument is not supported by the record. The record indicates that the level of services that SLS provided to NPR increased over time.

In addition, the discrepancy between the services that SLS provided and the terms of the client service agreements does not support an inference of interrelated operations. For example, the plaintiffs emphasize the fact that the agreements did not put any limits on SLS's access to NPR's bank accounts. Although the contracts did not outline the precise contours of the relationship between NPR and SLS, the plaintiffs have advanced no facts suggesting that SLS had access to NPR's assets for any purpose other than to provide the outsourced accounting and financial functions. Even though the agreements may not have been models of clarity, this fact does not suggest that the entities' operations were intertwined.

Furthermore, no reasonable finder of fact could conclude that NPR and SLS had interrelated operations based on their shared equipment and personnel. Although SLS employed NPR's IBM 3090 system, there is no evidence that NPR and SLS shared other equipment or capital assets. Additionally, the entities maintained their own offices in distinct locations at all times. This case therefore stands in sharp contrast to <u>Al</u>

<u>Bryant</u>, where the entities shared equipment and personnel to such an extent that the affiliated entity was merely an "operational shell."

Similarly, the fact that Leo Holt traveled with NPR representatives to market NPR to prospective clients does not support an inference of shared personnel. The plaintiffs argue that Leo Holt advertised the entire "Holt Family Enterprise" as a "single, unified provider" of shipping, stevedoring, warehousing and logistics services, but the record does not support this argument. Instead, in the deposition testimony on which the plaintiffs rely, Leo Holt testified that he traveled with NPR representatives "in a sales function." When asked what expertise he brought to bear, Mr. Holt explained that he offered "a knowledge of warehousing that the typical steamship salesperson wouldn't have." L. Holt 30(b)(6) Dep. at 84-85. Mr. Holt further explained that, when meeting with NPR's clients that came from within the Holt Group, Leo Holt provided "an introduction to the [NPR] salespeople." <u>Id.</u> at 86. The record therefore undermines the argument that Leo Holt advertised NPR and SLS as part of a unified entity. Instead, the facts support the inference that Leo Holt traveled with NPR pursuant to the marketing and sales functions that SLS provided.

Finally, the lack of a common business purpose between the entities undermines the inference that NPR and SLS shared

operations.  In Stardyne, the Court of Appeals explained that the "single employer doctrine generally applies to situations where two entities *concurrently* perform the same function."  Stardyne, 41 F.3d at 152.  To that end, the record is clear that NPR and SLS did not perform the same business function.  Whereas NPR engaged in stevedoring, warehousing and shipping functions, SLS provided "back office" services.  Moreover, each entity had overlapping, but distinct, clients.  NPR had clients that were not part owned by members of the Holt family, and SLS had clients that were not NPR.  The lack of a business purpose reinforces the Court's conclusion that no reasonable juror could find the operations between NPR and SLS to be interrelated.[43]

In view of the foregoing, the Court concludes that no reasonable juror could find that NPR and SLS shared interrelated operations.  However, this factor is not dispositive, and each factor in the "single employer" inquiry need not be present.  The Court turns to the remaining factors below.

_____

[43]The plaintiffs rely on Trafford for the proposition that two entities may operate as alter egos notwithstanding a lack of common business purpose.  The Court does not disagree with this contention.  In Trafford, the Court of Appeals reiterated that no one factor in the "disguised continuance" test is dispositive, and therefore the lack of common business purpose did not affect the outcome where "all the remaining alter ego factors point[ed] in a single direction."  478 F.3d at 182.  Although the present action arises in the distinct "double-breasted" context, this Court similarly does not regard lack of common business operations as dispositive.  It is one of several factors that the Court considers.

63

ii. <u>Centralized Control of Labor Relations</u>

Although no one factor in the "single employer" analysis is determinative, some courts have regarded central control over labor relations as the most important factor. <u>See, e.g.</u>, <u>NLRB v. Al Bryant, Inc.</u>, 711 F.2d 543, 552 (3d Cir. 1983); <u>NLRB v. O'Neill</u>, 965 F.2d 1522, 1529 (9th Cir. 1992).

In analyzing whether entities share common control over labor relations, courts have examined whether labor and employment decisions are controlled by the same entity or the same individuals;[44] whether the work forces at each entity have separate identities or whether there is a frequent interchange of employees between the entities; and whether the employees of one entity work for the other without compensation. <u>See, e.g.</u>, <u>Al Bryant, Inc.</u>, 711 F.2d at 552.

Moreover, because the "single employer" test is commonly applied in the "double-breasted" context, where one entity recognizes a union while the other does not, courts have also considered whether control over labor relations has been structured so as to avoid labor obligations. <u>See Limbach Co. v.</u>

---

[44]For instance, courts have focused on control over day-to-day employment decisions, such as hiring and firing, as well as control over labor relations, such as the negotiation of collective bargaining agreements. <u>See, e.g.</u>, <u>Limbach Co. v. Sheet Metal Workers Int'l Ass'n</u>, 949 F.2d 1241, 1261 (3d Cir. 1991) (noting that president of controlling entity met with union representatives); <u>Penntech Papers v. NLRB</u>, 706 F.2d 18, 26 (1st Cir. 1983) (focusing on "day-to-day labor matters" as well as controlling company's "apparent means to exercise its clout" in labor relations matters).

Sheet Metal Workers Int'l Ass'n, 949 F.2d 1241, 1260 (3d Cir. 1991); NLRB v. Big Bear Supermarkets #3, 640 F.2d 924, 930 (9th Cir. 1980).

The defendants argue that the facts do not support an inference that NPR and SLS shared centralized control over labor relations. Specifically, the defendants emphasize the fact that NPR's withdrawal liability arose out of its obligations to the International Longshoreman's Association ("ILA") Pension Trust Fund. In that respect, the defendants contend that there are no facts that would support an inference that SLS exerted any influence over NPR's use of ILA labor.

In opposition, the plaintiffs rely on the following facts to argue that SLS and NPR shared centralized control over labor: (1) NPR reduced its logistics staff from over sixty employees to approximately twenty-seven, while SLS swelled to 150 employees; (2) much of NPR's former logistics staff belonged to an office union, and the reduction of union costs was a motivating factor in NPR's decision to outsource; and (3) SLS hired approximately twelve former NPR logistics employees to work on NPR functions. The plaintiffs contend that the first two sets of facts establish that NPR and SLS coordinated lay-offs and hiring in an effort to avoid labor obligations, and that the third set of facts reveals common control over employment decisions.

The facts do not support an inference that NPR and SLS coordinated to avoid labor obligations. Although it is undisputed that NPR was motivated by a desire to reduce the costs associated with the office union, the record does not suggest that SLS participated in this decision. Importantly, the majority of SLS's new employees did not come from NPR. Moreover, the plaintiffs argue that the twelve employees that did come from NPR remained unionized at SLS. Although this fact is not clear from the record, if it is true, it undermines the inference that the plaintiffs advance. Instead, it supports the opposite inference, namely that NPR and SLS respected labor obligations. In sum, the record suggests that NPR's decision to lay off its unionized logistics employees was consistent with a general strategy of cutting costs by outsourcing.

The Court also finds this case to be distinguishable from the case law cited by the plaintiffs. In cases where centralized control over labor relations has been found, two entities have engaged in the same function, but one of the entities has failed to recognize a union. In <u>NLRB v. Big Bear Supermarkets #3</u>, 640 F.2d 924 (9th Cir 1980), a supermarket franchisor and a franchisee were deemed to be a single employer where, pursuant to a franchise agreement, the franchisor transferred unionized employees out of the franchise branch and the franchisee hired new employees, but refused to recognize the

franchisor's collective bargaining agreements. The Ninth Circuit found support for the NLRB's finding that "the purpose of the franchise agreement was the evasion of bargaining obligations." Id. at 930.

This case is distinguishable from Big Bear. Notably, NPR and SLS did not perform the same function. NPR's core business was shipping, stevedoring, and warehousing, and in accordance with this function, NPR employed ILA labor. Indeed, the liability at issue in this case was triggered by NPR's withdrawal from the ILA fund. However, the facts do not support an inference that NPR outsourced its logistics functions to SLS in order to avoid its obligations to the Fund, or that SLS exerted any control over NPR's decisions with respect to the ILA.

Finally, there is no indication in the record that the employees at NPR and SLS lacked separate identities. Although the record indicates that NPR and SLS employees interfaced on a daily basis, this fact is consistent with the nature of a client services relationship. Moreover, although twelve former NPR employees were hired by SLS, there is no evidence that any employees shifted back and forth between the entities, or that any employees at both entities were paid by the same source. Importantly, NPR had many employees that were unrelated to SLS, and SLS had employees that did not work on NPR's account.

In view of the foregoing, the Court concludes that no

67

reasonable juror could find that SLS and NPR shared centralized control of labor relations.

### iii. Common Ownership

Common ownership is satisfied where both entities share the same formal ownership. <u>Operative Plasterers & Cement Masons Int'l Ass'n Local 8 v. AGJ Constr., LLC</u>, 2009 U.S. Dist. LEXIS 64535, at *13 (D.N.J. July 24, 2009). However, formal ownership is not a pre-requisite to finding common ownership, and "actual control can be more significant than formal ownership." <u>NLRB v. Omnitest Inspection Servs.</u>, 937 F.2d 112, 118 (3d Cir. 1991). Cases in both the "double-breasted" and "disguised continuance" context[45] have found common ownership where a common person or entity has exercised control over both entities' financial operations or labor relations. <u>Omnitest</u>, 937 F.2d at 121. Courts have also found common ownership where the relationships between entities evidence the sort of continuous financial support or transfer of resources that are not typical of arms length transactions. <u>See, e.g.</u>, <u>NLRB v. O'Neill</u>, 965 F.2d 1522, 1530 (9th Cir. 1992).

The defendants argue that this factor cannot be satisfied because, in addition to the fact that NPR and SLS never

---

[45]Common ownership is a factor that courts consider in both the "double-breasted" and "disguised continuance" contexts. <u>See</u> <u>Stardyne</u>, 41 F.3d at 151-52.

shared formal ownership, the record does not support an inference that SLS and NPR shared common financial control. In support of their argument, the defendants cite to many of the same facts discussed above in the Court's discussion of the "interrelated operations" prong.[46]

In opposition, the plaintiffs argue that NPR and SLS did not operate at arms length, but rather that the entities transferred resources to one another and provided each other with financial support in a manner evidencing common ownership. The plaintiffs advance the following facts to support their argument: (1) SLS paid $3.7 million in insurance premiums to purchase insurance on NPR's behalf, but SLS never demanded reimbursement and ultimately wrote off the receivables; (2) NPR paid increased service fees to SLS at a time when NPR was facing financial distress, but received no additional services in return; (3) NPR participated in SLS's cash management system.[47]

The Court notes that it is unclear whether the

---

[46]Namely, the defendants argue that NPR maintained its own treasury department and did not participate in SLS's cash management system.

[47]The plaintiffs also argue that NPR and SLS were both commonly owned by Holt Sr. The plaintiffs explain that Holt Sr. owned the Holt Group, which in turn owned NPR. With respect to SLS, the plaintiffs rely on the argument advanced in their first theory, that Holt Cargo, a company controlled by Holt Sr., was the alter ego of SLS. Therefore, both NPR and SLS were owned by Holt Sr. The Court finds this argument to be barred by Brown. As the Court has explained at length, the alter ego inquiry must focus on the relationship between NPR and the Holt Sons Companies.

69

plaintiffs intend to argue based on the above facts that NPR and SLS were commonly owned by the Holt Group and Holt Sr., or that NPR was controlled and therefore owned by SLS. In either event, the analysis remains unchanged. As an initial matter, the record is clear that NPR and SLS maintained separate formal ownership. Further, the Court concludes that no reasonable juror could find that NPR and SLS shared common ownership based on financial control.

First, the record does not support the plaintiffs' argument that SLS wrote off approximately $3.7 million in insurance premiums that it purchased on NPR's behalf. The plaintiffs base this argument on portions of SLS's accounting records, which contain entries relating to an insurance policy held by NPR. These entries, which totaled approximately $3.7 million between 1998 and 2001, were marked with the notation "Adjustment Type NR." NPR Payments to SLS Chart, Ex. 2.A to App. C. to the Pls.' Opp'n. According to the plaintiffs' expert, Louis R. Pichini, SLS "reversed" and wrote off these charges, and NPR never paid for them.

However, in their reply, the defendants submitted the affidavit of John Janco, the current controller of Holt Logistics Corporation and a former employee of SLS, who explained that these amounts represented a credit to NPR for insurance proceeds received by SLS on NPR's behalf. Aff. of John Janco ("Janco

Aff."), Ex. 33 to Holt Sons Reply Br., ¶¶ 2-5. Mr. Janco
explained that these entries were part of SLS's asset accounts,
whereas if they had been invoices that were being written off,
they would have been contained within SLS's expense accounts.
Id. ¶ 6. At oral argument held on December 13, 2007, the
plaintiffs did not rebut this explanation or offer contrary
facts. Therefore, these accounting entries cannot support an
inference that SLS simply transferred $3.7 million to NPR.

In addition, the plaintiffs' arguments that NPR paid
increased service fees for no additional services, and that NPR
participated in SLS's cash management system, lack support in the
record for the same reasons discussed above. In brief, SLS
provided additional services to NPR as their relationship
progressed, and by 1999 or 2000, SLS had taken over most of NPR's
accounting functions. Moreover, the plaintiffs have advanced no
facts to support the inference that NPR participated in the cash
management system.

In sum, the record does not support an inference that
NPR and SLS shared common ownership, formally or otherwise.


iv.  Common Management

Finally, the "common management" factor is satisfied by
evidence that key management functions at two separate entities
were performed by the same group of people. See, e.g., NLRB v.

71

<u>Al Bryant, Inc.</u>, 711 F.2d 543, 551 (3d Cir. 1983); <u>Penntech Papers v. NLRB</u>, 706 F.2d 18, 25 (1st Cir. 1983). Courts have looked to similar factors in the "disguised continuance" context.[48] <u>See, e.g.</u>, <u>Trafford Distrib. Ctr. v. NLRB</u>, 478 F.3d 172, 179-80 (3d Cir. 2007).

The defendants argue that NPR and SLS maintained different management and supervisory personnel, and that the sole overlap between the two entities was Thomas Holt, Jr., who replaced Ronald Katims as president of NPR in 1999, and was also an owner of SLS. The defendants argue that these facts cannot support an inference of common management.

In opposition, the plaintiffs argue that several facts establish that SLS exerted management influence over NPR. First, the client services agreement between NPR and SLS provides that "[SLS] will provide personnel to meet and consult with NPR regarding any issue arising in connection with NPR's continuing business affairs." In addition, Leo Holt traveled with NPR representatives to help market NPR. The plaintiffs argue that these two facts support the inference that Leo Holt was responsible for sales and marketing at both entities.

Moreover, the plaintiffs cite to the fact that Mark Cimaglia, an SLS employee, testified that he received his instructions from John Whiteley and regarded Mr. Whiteley as his

---

[48]The common management factor is common to both the "single employer" and the "disguised continuance" tests.

72

boss.  According to the plaintiffs, this undermines the inference

that SLS performed logistics functions for NPR based on NPR's

guidance, and instead suggests that John Whiteley made key

decisions on NPR's behalf.

The plaintiffs also argue that NPR exerted management

influence over SLS.  The plaintiffs point to several facts in

support of this argument: (1) Bernard Gelman, who was the CFO of

the Holt Group and Holt Cargo, was also the CFO of NPR and

provided guidance to Leo Holt; and (2) Mr. Gelman provided SLS

with advice regarding the appropriate accounting treatment of

several start-up loans that SLS received.  Based on these facts,

the plaintiffs argue that Mr. Gelman participated in SLS's

management.

The Court concludes that the facts do not support an

inference of common management.  With respect to the clause in

the client services agreement, the Court notes that the provision

provides that SLS employees will "meet and consult" with NPR

employees.  The clause does not envision a management or

decision-making role for SLS.  Similarly, with respect to Leo

Holt's role in marketing NPR, the plaintiffs' reliance on Mr.

Holt's testimony is greatly exaggerated.  The plaintiffs argue

that Leo Holt advertised NPR as a "one stop shop" and developed a

"comprehensive business plan" for NPR.  However, these arguments

do not find support in the record.  Instead, Leo Holt testified

that he was "trying to help NPR develop collaborative [sic] marketing ideas." L. Holt 30(b)(6) Dep. at 85. The record cannot support an inference that Leo Holt was responsible for sales and marketing at both entities.

With respect to Mark Cimaglia, the plaintiffs have offered no evidence that Mr. Cimaglia worked on NPR functions while employed by SLS. Instead, the defendants cited to the deposition of Mr. Cimaglia, who indicated: "I was not part of the SLS staff that handled NPR's transactions." March 23, 2005 Dep. of Mark Cimaglia ("3/23/05 Cimaglia Dep."), Ex. 32 to the Holt Sons Reply Br., at 194. Needless to say, the fact that Mr. Cimaglia – an SLS employee who did not work on NPR functions – received instructions from Mr. Whiteley and regarded Mr. Whiteley as his boss says nothing about whether the latter made decisions on NPR's behalf or acted in a managerial role.

Finally, the plaintiffs' arguments with respect to Mr. Gelman are not supported by the record. First, the record does not support the plaintiffs' statement that Mr. Gelman served as CFO of NPR. Instead, Thomas Holt, Jr. explained that Mr. Gelman was the CFO of Holt Cargo and the Holt Group, and performed CFO-like functions for NPR "[t]o a certain extent ... as it related to banking and whatnot, dealing with banks." September 3, 2003 Dep. of Thomas Holt, Jr. ("9/3/03 Holt Jr. Dep."), Ex. 7 to App. A to Pls.' Opp'n, at 71-72.

Moreover, the record does not indicate that Leo Holt relied on Mr. Gelman. Instead, Leo Holt testified that SLS's accounting department, not he, relied on Mr. Gelman's direction "quite often," and in some instances "t[ook] direction from him." Leo Holt explained that this was because Mr. Gelman worked at several companies within the Holt Group, and these companies formed a "major client of [SLS]." September 9, 2003, Dep. of Leo Holt ("9/9/03 L. Holt Dep."), Ex. 3 to App. A to the Pls.' Opp'n, at 349. The record does not indicate whether Mr. Gelman provided said direction on behalf of NPR, or on behalf of the other Holt Group companies at which he was employed. Even assuming Mr. Gelman provided direction to SLS's accounting department on behalf of NPR, this fact would be consistent with a client services relationship. Specifically, one would expect that a large client such as NPR would provide direction to SLS's accounting department, in view of the fact that one of SLS's primary roles was to handle NPR's accounting functions.

Similarly, the fact that Mr. Gelman advised SLS regarding its accounting classification of certain loans cannot support an inference of common management. John Whiteley's testimony, on which the plaintiffs rely, indicates that Mr. Gelman provided tax advice and suggested that SLS reclassify certain loans as shareholder loans. However, no facts suggest that any loans came from NPR, or that Mr. Gelman played a role in

the actual decision to make such loans. In sum, Mr. Gelman's

relationship with SLS cannot support an inference that he

participated in its management.

Finally, although the plaintiffs do not advance any

argument in this regard, the Court's analysis is unaffected by

the fact that Thomas Holt, Jr. was both the president of NPR and

an owner of SLS. The record is unclear on the extent to which

Thomas Holt, Jr. was involved in the management of SLS once he

became president of NPR, although Mr. Holt testified that he was

not involved in the negotiation of the client service agreements

between the two entities. August 11, 2006, Dep. of Thomas Holt,

Jr. ("8/11/06 Holt Jr. Dep."), Ex. 8 to App. A to Pls.' Opp'n, at

42-43. Even assuming Thomas Holt, Jr. remained active at both

entities, one overlapping individual cannot support an inference

of common management, where the facts suggest that fundamental

decisions at each entity were largely made by internal, non-

overlapping personnel.

In light of the above analysis, the Court concludes

that the undisputed facts cannot support an inference that NPR

and SLS operated as a "single employer." Moreover, based on the

plaintiffs' failure to advance any argument connecting NPR to the

remaining Holt Sons Companies - as well as the Court's

independent review of the record - the Court concludes that no

reasonable juror could find that NPR operated as a "single

employer" with the remaining Holt Sons Companies.  Accordingly,
the Holt Sons Defendants are entitled to summary judgment under
this theory.  The Court turns to the alternative common law alter
ego test below.

### b.    The Federal Common Law Test

The federal common law alter ego test (hereinafter the
"alter ego test") has been referred to interchangeably as both
the "alter ego test" and the "veil-piercing test" in Third
Circuit case law.  See, e.g., Trs. of the Nat'l Elevator Ind.
Pension, Health Benefit and Educ. Funds v. Lutyk, 332 F.3d 188,
192-93 (3d Cir. 2003).  The test is a tool of equity, whose
purpose "is to prevent an independent corporation from being used
to defeat the ends of justice, to perpetrate fraud, to accomplish
a crime, or otherwise to evade the law."  Bd. of Trs. of
Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164
(3d Cir. 2002).  Where applicable, the doctrine permits a court
to disregard the corporate form and impose liability on the
"person or entity controlling the corporation."  Lutyk, 332 F.3d
at 192 (citations omitted).

In determining whether to disregard the corporate form,
the Court of Appeals for the Third Circuit has considered the
following factors, which derive from the Court of Appeals'
decision in United States v. Pisani, 646 F.2d 83 (3d Cir. 1981):

77

> gross undercapitalization, failure to observe
> corporate formalities, nonpayment of dividends,
> insolvency of debtor corporation, siphoning of
> funds from the debtor corporation by the dominant
> stockholder, nonfunctioning of officers and
> directors, absence of corporate records, and
> whether the corporation is merely a facade for the
> operations of the dominant stockholder.

Lutyk, 332 F.3d at 194 (quoting Pearson v. Component Tech. Corp.,
247 F.3d 471 (3d Cir. 2001)). Moreover, although proof of actual
fraud is not a pre-requisite, the situation must present an
element of injustice or fundamental unfairness, and alter ego
status must be established by clear and convincing evidence. Id.

The above factors do not form a rigid test;
instead, the essence of the inquiry is "whether the debtor
corporation is little more than a legal fiction." Id.
Nonetheless, the test has been described as "notoriously
difficult for plaintiffs to meet." Pearson, 247 F.3d at 485.
Where plaintiffs seek to show that two corporations are alter
egos of each other, the "plaintiffs must essentially demonstrate
that in all aspects of the business, the two corporations
actually functioned as a single entity." Id.

Third Circuit case law is not clear on whether the
alter ego test should be applied to the present action. The test
has most frequently been applied by the Court of Appeals in the
context of traditional veil piercing claims, where a plaintiff
seeks to impose indirect liability on a person or entity
controlling a corporation. In Lutyk, for example, the Court of

Appeals reviewed whether the alter ego test had been correctly applied to impose indirect liability for unpaid ERISA contributions on the president and sole shareholder of a corporation.[49]  332 F.3d at 191-92.  Relatedly, the Court of Appeals in Pearson explained that the alter ego test is often applied to impose a subsidiary's liabilities on its corporate parent.  Pearson, 247 F.3d at 485.

In the present case, however, the entities in question are related corporations, rather than parent and subsidiary. Moreover, the plaintiffs seek to impose direct, rather than indirect, withdrawal liability on the Holt Sons Companies. Nonetheless, case law suggests that the alter ego test may be appropriate in such a scenario.  In Foodtown, the Court of Appeals reviewed whether the plaintiff had stated a claim for MPPAA withdrawal liability against related corporations, on the basis that the corporations were alter egos of a bankrupt entity. In its analysis, the Court applied an alter ego test similar to the one employed in Lutyk and concluded that the plaintiff had stated a claim for alter ego liability.  Foodtown, 296 F.3d at 172-73.

However, Foodtown does not settle the issue, because

_____

[49]In Lutyk, the separate question of whether veil piercing and alter ego claims are available under ERISA and the MPPAA was not raised on appeal, and was therefore not addressed by the Court. Lutyk, 332 F.3d at 192.  This Court in Brown concluded that such claims are available to a limited extent, as discussed above.

neither the availability of alter ego claims under the MPPAA, nor the question of the appropriate test to be applied, was raised before the Court on appeal. See Brown v. Astro Holdings, Inc., 385 F. Supp. 2d 519, 530 (E.D. Pa. 2005) (noting that appellate briefs in Foodtown did not raise above questions). Moreover, Foodtown applied New Jersey veil piercing factors, rather than the substantively identical federal common law factors articulated in Lutyk. Foodtown, 296 F.3d at 171.

Because of the ambiguity in the case law, the Court is hesitant to conclude that the federal common law alter ego test, rather than the "single employer" test, should be applied to this action. However, the Court will not resolve this issue, because it concludes that the outcome is the same under both tests. The Court's analysis with respect to the alter ego test, as articulated in Lutyk, is below. Because of the uncertainty surrounding this issue, the Court will apply a preponderance of the evidence, rather than a clear and convincing, standard.

Before applying the alter ego test, the Court notes that the plaintiffs have advanced no argument with respect to this test in the context of their alter ego theory. Instead, the plaintiffs assume that it does not apply, and devote their brief to arguing for the applicability of the "single employer" test. As a consequence, the plaintiffs have not addressed the merits of the Holt Sons Defendants' motion as it relates to the alter ego

test.[50]  Nonetheless, the Court has attempted to give the
plaintiffs the benefit of the doubt, and has independently
reviewed the record in order to resolve this issue.  Based on the
Court's review of the record, it concludes that no reasonable
juror could find that NPR and SLS were alter egos.

### i.  Gross Undercapitalization

To determine whether a corporation was grossly
undercapitalized, courts look to whether a corporation's initial
capitalization was adequate for its purposes.  Lutyk, 332 F.3d at
197.  This factor cannot be established solely by evidence that a
corporation maintained a shortage of capital or became insolvent.
Instead, courts inquire into this factor to determine whether a
corporation's initial capitalization supports an inference that
the entity was established "to defraud its creditors" or for some
"other improper purpose such as avoiding the risks known to be
attendant to a type of business."  Id.

With respect to SLS, the plaintiffs argue at different
points in their brief that the entity was undercapitalized
because the Holt Sons could not recall whether or to what extent
the company was initially capitalized, and admitted that any

---

[50]Although the plaintiffs have made arguments with respect
to the Lutyk factors, those arguments arise in the context of the
plaintiffs' veil piercing claims against the individual Holt
Sons.  The Court will discuss those arguments that are equally
applicable to the alter ego inquiry below.

capitalization would have been modest in view of SLS's limited capital needs. Moreover, the plaintiffs cite to the fact that much of SLS's initial funding came in the form of a $1,277,000 advance from Holt Cargo.

The record does not support an inference that either SLS or NPR was grossly undercapitalized. With respect to SLS, the plaintiffs have not identified - and the Court has not found - any facts in the record indicating what level of capital an entity of SLS's size would require. Similarly, there is no evidence that SLS lacked adequate capital for its business purposes at, or subsequent to, its formation. The fact that SLS may have had limited capital does not necessarily mean that it had insufficient capital. Moreover, SLS's receipt of a loan from Holt Cargo is irrelevant to the question of whether NPR and SLS were alter egos. Nothing in the record suggests that SLS received loans from, or was otherwise capitalized by, NPR.[51]

The plaintiffs have advanced no arguments or analysis with respect to the capitalization of NPR. In addition, the Court has conducted its own review of the record and has found no evidence regarding NPR's capitalization, or whether it was adequate for NPR's purposes at the time of its formation.

Therefore, on the basis of the record, no reasonable juror could conclude that either NPR or SLS was grossly

---

[51]It bears mentioning that SLS was formed three years before the Holt Group acquired NPR in 1997.

undercapitalized.  See Lutyk, 332 F.3d at 197 (finding

insufficient evidence of gross undercapitalization where record

contained no evidence as to level of capital required for

similarly situated entities).


                    ii.  Corporate Formalities and Records

            A dearth of corporate formalities and records may be

evidenced by a lack of formal documentation, such as accounting

ledgers or tax returns; the commingling of funds, assets and

personnel between entities; and a lack of a separate management

structure between entities, among other factors.  See, e.g.,

Lutyk, 332 F.3d at 195-96; Foodtown, 296 F.3d at 172.

            The record does not support an inference that NPR and

SLS failed to observe corporate formalities or to maintain

corporate records.  Each entity maintained largely independent

management, personnel and assets.  The record is also replete

with substantive accounting documents detailing many of the

transactions between the two entities.[52]  Moreover, no facts

suggest that SLS and NPR commingled funds.  As the Court has

discussed at length, the plaintiffs' arguments that SLS and NPR

transferred resources to one another for no consideration do not

_____

        [52]The plaintiffs focus on accounting irregularities with
respect to advances between SLS and other Holt-related entities
that are not NPR.  Such arguments are irrelevant to the question
of whether NPR and SLS were alter egos.

                                83

find support in the record.[53]

Finally, the discrepancy between the client services agreements and the actual services that SLS provided does not support an inference that NPR and SLS disregarded the corporate form. This is not an instance where two entities provided services for one another without contract and without compensation. The fact that the agreements did not match reality may suggest that the entities were not as thorough in their dealings as would be expected. However, these facts do not support the inference that NPR and SLS "failed to maintain formal barriers." See Foodtown, 296 F.3d at 172.

### iii. Non-Payment of Dividends and Non-Functioning of Corporate Officers

In closely-held corporations such as NPR and SLS, the failure to pay dividends and the non-functionality of corporate officers, directors and shareholders "are not unusual," and are therefore "not a strong factor in favor of piercing the corporate veil." Lutyk, 332 F.3d at 196.

Whether NPR or SLS paid dividends is not clear from the record, and neither party addresses this point. With respect to the non-functioning of corporate officers, the Court's analysis

---

[53]Specifically, the plaintiffs' arguments relate to the cash management system and the payment history between NPR and SLS. For substantively the same reasons discussed in the context of the "single employer" test, the Court concludes that the record does not support the plaintiffs' arguments.

on this point mirrors its discussion of the "common management"
factor of the "single employer" test.[54]  In brief, the record
indicates that NPR and SLS maintained largely independent
corporate officers, and the entities did not exert management
influence over one another.

        The sole overlap between the entities was Thomas Holt,
Jr., who was an owner of SLS and served as president of NPR for
some time.  However, Thomas Holt, Jr.'s overlapping role is
insufficient to support an inference of non-functioning officers,
in view of the facts suggesting that fundamental decisions at
each entity were made by internal, non-overlapping personnel.

                        iv.  Insolvency of the Debtor Corporation and
                             Siphoning of Funds

        Because insolvency, without more, cannot satisfy the
alter ego test, insolvency is often considered in conjunction
with whether a dominant stockholder has siphoned funds from a
failing corporation.  See, e.g., Lutyk, 332 F.3d at 195 (citing
United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981)).  Courts
have found siphoning of funds where a dominant stockholder
directly withdraws funds from a declining entity, or causes the
entity to repay stockholder loans while creditors remain unpaid.

_____

        [54]The plaintiffs advance many of the same arguments
discussed above, with particular emphasis on the fact that the
Holt-related entities "abdicated" management responsibility to
John Whiteley.

                                85

See, e.g., Lutyk, 332 F.3d at 195.

No reasonable juror could conclude that NPR's funds were improperly diverted to SLS during NPR's financial troubles. The plaintiffs' principal argument is that SLS repaid certain outstanding loans to other Holt Sons Companies, rather than to Holt Cargo and Orchard Hill, during NPR's financial difficulty. Had SLS repaid its loans to Holt Cargo and Orchard Hill - both of which were entities within NPR's controlled group - those funds would have been available to help cover NPR's withdrawal liability.

The record does not indicate that Orchard Hill or Holt Cargo, much less NPR, had any involvement in SLS's decision to repay these loans. Instead, the Court finds the facts to be too attenuated to support an inference that NPR's funds were improperly diverted.

### v. Facade for the Operations of the Dominant Stockholder

The record also fails to support an inference that either NPR or SLS operated as a mere "sham" or "legal fiction" for the other, or that the corporate form was manipulated so as to defraud creditors. As explained by the Pearson court, the alter ego test requires a showing that "in all aspects of the business, the two corporations actually functioned as a single entity and should be treated as such." Pearson, 247 F.3d at 485.

On this point, the record is clear that each entity maintained a distinct business purpose and served different customers. Although an outsourcing relationship by definition involves a transfer of certain functions, no reasonable juror could conclude on that basis that either entity became a mere legal fiction.

### vi. Injustice or Fundamental Unfairness

Finally, the alter ego test requires that the situation "present an element of injustice or fundamental unfairness," but a combination of the above factors can be sufficient to satisfy this showing. Lutyk, 332 F.3d at 198; Pisani, 646 F.2d at 88. Because none of the above factors favors disregarding the corporate form, they do not combine to demonstrate fundamental unfairness.

Further, beyond these factors, the Court concludes that this is not a case where injustice will result if the corporate form is respected. As the Court has discussed throughout this memorandum, the record indicates that NPR and SLS were more than mere divisions of a fictitiously fractionalized entity; they were entities with separate identities and business purposes. There are no facts supporting an inference that either entity engaged in inequitable conduct with an eye to defrauding creditors or the ILA Fund in particular.

It bears repeating that the withdrawal liability that

spawned this case arose from both the PRMSA's and NPR's use of ILA labor. However, neither SLS nor the remaining Holt Sons Companies ever employed ILA labor, served as parties to any collective bargaining agreements with respect to ILA labor, or exerted influence over the use of said labor. Taking a holistic view of this case, the Court is convinced that no fundamental unfairness or injustice will result from a conclusion that NPR and SLS were not alter egos.

Similarly, the record contains no facts that would support a finding of alter ego status between NPR and the remaining Holt Sons Companies, a point to which neither side devotes significant analysis. The Holt Sons Defendants are thus entitled to summary judgment on the plaintiffs' alter ego claims.

C.   Plaintiffs' Veil Piercing Theories

The plaintiffs argue that the Court should pierce the corporate veil of SLS and hold the Holt Sons individually responsible for NPR's withdrawal liability. As this Court explained in Brown, veil piercing claims are available under the MPPAA to impose indirect liability on individual owners of a corporation for an underlying ERISA violation. Brown v. Astro Holdings, Inc., 385 F. Supp. 2d 519, 534 (E.D. Pa. 2005). However, because the plaintiffs cannot establish that the Holt Sons Companies were alter egos of NPR, it follows that the

plaintiffs cannot establish that the Holt Sons Companies committed an underlying ERISA violation that would justify piercing the corporate veil. As a consequence, the Court will grant summary judgment to the Holt Sons Defendants on the plaintiffs' veil piercing theories.

D.    Plaintiffs' Original "Controlled Group" Theory

The plaintiffs continue to advance the "controlled group" theory of liability from their original complaint, and argue that the Holt Sons Companies are statutorily liable for NPR's withdrawal because they were members of NPR's controlled group pursuant to 29 U.S.C. § 1301(b)(1). The regulations interpreting "common control" establish a brightline test based purely on stock ownership. See 26 C.F.R. § 1.414(c)-2; see also United States v. Vogel Fertilizer Co., 455 U.S. 16 (1982);[55] Pearson v. Component Technology Corp., 247 F.3d 471, 488 n.5 (3d Cir. 2001). This brightline test was intended to replace the "subjective, case-by-case analysis that had previously prevailed." Vogel, 455 U.S. at 35. In this case, the record is

_____

[55]In Vogel, the Supreme Court analyzed the statutory definition of "common control" set forth in 26 U.S.C. § 1563(a)(2). Although § 1563(a)(2) defines "common control" for tax rather than ERISA purposes, the definitions contained therein are substantively identical to those set forth in 26 C.F.R. § 1.414(c)-2. Moreover, courts have treated these provisions interchangeably. See IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 123 (3d Cir. 1986) (analyzing existence of common control for MPPAA purposes by reference to § 1563(a)(2)).

clear that NPR and the Holt Sons Companies did not share common stock ownership at any relevant time period. Further, nothing in the record suggests that this case falls within the six scenarios where constructive ownership will be recognized based on stock attribution rules. See 26 U.S.C. § 1563(e); Barker, 788 F.2d at 123. Because NPR and the Holt Sons Companies were not part of the same controlled group, the Holt Sons Defendants are entitled to summary judgment on this theory.

Finally, the plaintiffs advance an alternative theory based on ERISA "avoidance" liability pursuant to 29 U.S.C. § 1392(c). The plaintiffs argue that two of the Holt Sons Companies, Express Equipment Rental ("Express") and Gloucester Marine Terminal ("GMT"), would have been part of NPR's controlled group but for sham transactions. The plaintiffs contend that Holt Sr. was the real owner of each of these entities, and he orchestrated sham transactions by which the entities were transferred to Delaware Avenue Enterprises ("Del"), another Holt Sons Company, during NPR's financial difficulty.

The plaintiffs' "avoidance" claim is not properly before the Court. Specifically, the plaintiffs did not assert an avoidance claim under under 29 U.S.C. § 1392(c) in their amended complaint. Instead, the plaintiffs raised this claim for the first time in their opposition to the Holt Sons Defendants' motion for summary judgment. Nonetheless, even if the claim were

properly before the Court, the claim would face the same obstacles as the plaintiffs' "controlled group" argument. Specifically, the plaintiffs concede that neither Express nor GMT was ever formally owned by Holt Sr. Instead, the plaintiffs argue that Holt Sr. exerted effective control over each of these entities and thereby became their true owner. However, entities become part of a controlled group based on common stock ownership, not effective control. As a consequence, neither Express nor GMT was ever within NPR's controlled group, and the plaintiffs cannot prevail on a claim under § 1392(c).

Because the Court will grant summary judgment to the Holt Sons Defendants on the plaintiffs' controlled group and avoidance claims, it follows that the plaintiffs' derivative veil piercing claims must also fail.[56]

E. Conclusion

In view of the foregoing analysis, the Court will grant the Holt Sons Defendants' motion for summary judgment in its entirety. The Court will also deny the plaintiffs' request for additional discovery contained in their Rule 56(f) affidavit, because the Court concludes that the plaintiffs have had ample opportunity to conduct discovery in this matter, including the

---

[56]The plaintiffs contend that the Court should pierce the corporate veils of Express, GMT and Del and hold the individual Holt Sons liable.

chance to conduct discovery on claims that were not asserted in the plaintiffs' original complaint. The Court concludes that additional discovery at this juncture would be duplicative and would unnecessarily prolong this action.

An appropriate order shall issue separately.